304 S.E.2d 824

**CITY OF FAIRMONT, W.Va., etc.**

v.

**William M. HAWKINS, and
USF & G Co.**

No. 15678.

Supreme Court of Appeals of
West Virginia.

June 22, 1983.

George R. Higinbotham, Higinbotham & Higinbotham, Fairmont, for appellant.

Alfred J. Lemley, Furbee, Amos, Webb & Critchfield, Fairmont, for Wm. M. Hawkins.

Herschel Rose, Rose Southern & Padden, Fairmont, for USF & G Co.

MILLER, Justice:

In this appeal from a final judgment rendered against the appellant, City of Fairmont, we are asked to determine whether a mayor of a municipality has the authority to settle a claim on behalf of a municipality. We are also asked to determine if a mayor can be held personally liable for the payment of the claim.

During appellee Mayor William M. Hawkins' term of office in May, 1975, a property damage suit was brought by Charles Glaspell against the City of Fairmont for water damage to his home. Hawkins asserted that he made a personal investigation of the damage and found it to exceed $10,760. The City disputed this figure because of a letter written by Glaspell's attorney wherein he indicated that "[t]he actual loss is something less than $5,000." Glaspell apparently came to Hawkins and offered to settle for $8,500.

It appears that the City Attorney informed Hawkins that the claim should be litigated, but that he as mayor had the power to settle it. On August 25, 1977, Hawkins without any formal action by the City Board of Directors[1] had a check drawn on the City's Water Department's account for $8,500 made payable to Glaspell. The City Finance Director refused to sign the check because there was no voucher, but Hawkins signed as Mayor, as Acting Water Director and as Acting Finance Director, thus, in effect issuing the check on his own authority.

The City instituted a suit against Hawkins seeking to recover the alleged improper settlement and also joined United States Fidelity and Guaranty Company which had issued a public employees fidelity bond.[2] The circuit court sitting without a jury found that the Glaspell claim was valid and that Hawkins was advised that he had the authority to settle the claim. The circuit court concluded that Hawkins was acting

---

1. The City of Fairmont utilized a commission form of government with the legislative power lodged in a Board of Directors. As a result of a special election, at the time of the Glaspell suit it was in transition to a council-city manager form of government. The parties do not, however, dispute that the legislative power was lodged with the Board of Directors.

2. The circuit court did not address the liability of the bonding company United States Fidelity and Guaranty Company, and, therefore, this issue is not before us.

in good faith and was not negligent in settling the claim, therefore, he was found not liable. We believe that the circuit court misperceived the law.

The suit against Hawkins was predicated on two theories. First, that from a legal standpoint, the Mayor had no authority to settle a lawsuit instituted against the City. A second claim was based on the fact that he had signed the check as the Acting Water Director and as the Acting Finance Director in contravention of the City's charter provisions.

Hawkins' defense was that in settling the claim he thought he had authority to do so because the City Attorney had advised him he had such authority. He also claimed that the suit had been discussed with the City's Board of Directors, who had orally authorized him to settle it. Finally, with regard to the signing of the check in the capacity of acting directors, he asserted that he had done this on prior occasions and had never been challenged on such practice. The circuit court found these facts to be true.

## I.

■ We begin by noting that our general municipal statutes authorize a municipality to compromise lawful claims presented or filed against it. A municipality has the plenary power and authority "to institute, maintain and defend any civil action or other proceeding in any court." W.Va. Code, 8–12–1(3). And, under W.Va.Code, 8–12–2(4), municipalities are authorized to provide in their charters or by ordinance for "[t]he presentation, ascertainment, disposition and discharge of claims against the city."[3]

■ As a corollary to this rule is the principle that in the absence of some contrary provision, the power to compromise a claim is lodged with the legislative branch of the municipality and, therefore, a mayor is not empowered to compromise claims. E.g., Jenkins v. City of Bowling Green, 261 Ky. 679, 88 S.W.2d 692 (1935); De Muro v. Martini, 137 N.J.L. 640, 61 A.2d 230 (1948), aff'd 1 N.J. 516, 64 A.2d 351; George A. Fuller Co. v. Commonwealth, 303 Mass. 216, 21 N.E.2d 529 (1939); 56 Am.Jur.2d Municipal Corporations, Etc. § 809 (1971); 62 C.J.S. Municipal Corporations § 543(6) (1949); Annot., 15 A.L. R.2d 1359 (1951). None of the parties point to any specific statutory or charter provisions that empower the mayor to compromise claims on behalf of the city.

Perhaps, in an implied acknowledgement that he had no specific authority, Hawkins asserts that he had discussions with the Board of Directors, the legislative body, on one or more occasions and a majority agreed the claim should be settled and orally authorized him to settle it. Significantly, there was no claim made that the Board ever authorized settlement at a particular figure.[4]

■ We do not believe that an oral approval by the Board of Directors of the City constitutes a sufficient basis for finding that there had been a proper authorization made by the Board to Hawkins. In Syllabus Point 4 of Ray v. City of Huntington, 81 W.Va. 607, 95 S.E. 23 (1918), we said:

3. Most jurisdictions hold that even in the absence of an express power to settle claims, a municipality possesses such power unless there is an express statute or charter provision forbidding such compromise. City of Coral Gables v. State, 128 Fla. 874, 176 So. 40 (1937); People ex rel. Ammann v. Dipper, 392 Ill. 38, 63 N.E.2d 870 (1945); George A. Fuller Co. v. Commonwealth, 303 Mass. 216, 21 N.E.2d 529 (1939); Edelstein v. Ashbury Park, 51 N.J.Super. 368, 143 A.2d 860 (1958); Hauck v. Bull, 79 S.D. 242, 110 N.W.2d 506 (1961); 17 McQuillin, Law of Municipal Corporations § 4817 (3rd ed. 1982); Annot., 15 A.L.R.2d 1359 (1951). This rule is based on the general premise that a municipality is a creature of the legislature and can exercise those powers expressly or by necessary implication given to it; and, the power to compromise claims is necessarily implied.

4. The circuit court found that "[t]here was no written record or memorandum or affirmative vote reflecting a majority of at least three members of the Board of Directors of the City of Fairmont authorizing that Civil Action No. 7513 be settled for $8,500.00 and to appropriate that sum to settling said civil action."

"Ordinarily a municipality acts only through its assembled council, whose will can be expressed only by a vote embodied in some distinct and definite form."
*See also City of Moundsville v. Yost*, 75 W.Va. 224, 83 S.E. 910 (1914).

The question in *Ray v. City of Huntington, supra*, was whether the city had delegated its authority to establish and designate streets to the city engineer. There was no municipal record of the delegation and this Court stated:

"When it undertakes to exercise the right conferred and perform the duty imposed, it can do so only by an ordinance, order, or resolution regularly passed and recorded as required by sec. 38 of the charter (Acts 1901, ch. 150), which shall be kept open and subject, whenever convenient, to inspection by any one interested in knowing what the corporation has done affecting his interest." 81 W.Va. at 610, 95 S.E. at 24.[5]

In *Edwards v. Hylbert*, 146 W.Va. 1, 9–10, 118 S.E.2d 347, 352 (1960), we said: "[T]he members of a fiscal body such as a municipal council may act only as a group, and that such members can not bind the fiscal body by acting separately and individually."

Similar law was applied to a county court [now county commission], which was recognized to be a public corporation, in *Daugherty v. Ellis*, 142 W.Va. 340, 97 S.E.2d 33 (1956). In that case, a commissioner was accused of making improper sales of livestock from the county-owned poor farm without the commission's approval. He claimed the sales were subject to the approval or ratification of the other members. However, there was no record of any approval or ratification except oral testimony of another commissioner that he had an individual discussion with the involved commissioner. Judge Haymond outlined the law relating to how a public body must proceed to take official action and summarized these principles in Syllabus Points 2, 3 and 4:

"2. A county court, a corporation created by statute, can do only such things as the law authorizes it to do, and it must act in the manner prescribed by law.

"3. A county court can exercise its powers only as a court, while in legal session with a quorum present, and it must follow that procedure and enter its proceedings of record to make its action valid and binding.

"4. The members of a county court can not separately and individually give their consent or enter into a contract and in that manner obligate the court as a corporate entity."

In the present case, we do not believe there was a sufficient basis for the circuit court's conclusion that Hawkins had been specifically delegated the power to compromise the Glaspell claim.

### II.

■ Independent of Hawkins' authority to settle the claim is his failure to follow the prescribed payment procedure. Section 106 of the Charter of the City of Fairmont, 1915 W.Va. Acts ch. 10 & 1919 W.Va. Acts ch. 21, provides in relevant part: "No warrant for the payment of any claim shall be issued by the director of finance, unless such claim shall be evidenced by a voucher approved by the head of the department for which the indebtedness was incurred and countersigned by the board of directors."

The circuit court found that:

"Mayor Hawkins signed the check in his capacity as Mayor. The Water Director was absent at the time, so he signed the check as Acting Water Director. The Finance Director refused to sign the check earlier in the day because there was no voucher for the check, and was not present when Mr. Glaspell came for

---

5. The requirement for keeping a record of the city council meetings is found in W.Va.Code, 8-9-3, which in pertinent part provides: "The governing body of every municipality shall cause to be kept, in a well-bound book, an accurate record of all of its proceedings, ordinances, orders, bylaws, acts, resolutions, rules and regulations which shall be fully indexed and open to inspection by anyone who is required to pay taxes to such municipality." Its counterpart can be traced to Sections 25 and 26 of Chapter 47 of the Code of 1868.

the check so Mayor Hawkins signed the check as Acting Finance Director."

Hawkins contends that mere irregularity in the manner in which payment is made does not render an official liable and cites 146 A.L.R. 762 (1943). We do not believe that this law is applicable to the facts of this case. Here, there was no authority vested in Hawkins to draw checks on the City Treasury. This he must have known because he signed the check as "Acting Water Director" and "Acting Finance Director." There were no such positions authorized under the City's Charter nor any provision that permitted an official to assume the role of another official in his absence. Finally, no attempt was made to have the check approved by the Board of Directors as was required by Section 106 of the City Charter.

We do not have the situation covered in the foregoing annotation which involves the question of a public official who has the authority to disburse public funds but fails to follow all of the prescribed disbursement procedures. *E.g., City of Lowell v. Massachusetts Bonding & Ins. Co.,* 313 Mass. 257, 47 N.E.2d 265 (1943); *State v. Kimball,* 96 N.H. 377, 77 A.2d 115 (1950); *Smith Engineering Works v. Custer,* 194 Okl. 318, 151 P.2d 404 (1944). Here, Hawkins was not initially authorized to disburse funds. We are not cited nor have we found cases dealing with the situation where a public official having no authority to disburse funds does so by executing a check on behalf of those authorized to do so by styling himself as an acting official.

In *Daugherty v. Ellis, supra,* we quoted from our earlier case of *State ex rel. Sonner v. Dean,* 98 W.Va. 88, 126 S.E. 411 (1925), which defined malfeasance as doing an act which is unlawful or wrongful. A number of other similar definitions of malfeasance were set out in *Daugherty:*

"Malfeasance has been defined by appellate courts in other jurisdictions as a wrongful act which the actor has no legal right to do, ... as an act for which there is no authority or warrant of law, ... and as the unjust performance of some act which the party performing it

has no right, or has contracted not, to do." 142 W.Va. at 357, 97 S.E.2d at 42. (Citations omitted)

We believe that Hawkins as mayor lacked the power to issue the check and his action in so doing was unlawful and constituted malfeasance.

Hawkins' defense that similar payments had been made in the past and no objections were made is not valid. The law is clear that where a specific statute or ordinance exists prescribing how official acts should be done, the statutory mandate may not be circumvented by permitting the public official to show that in the past the required statutory procedure has been ignored. In *State v. Chilton,* 49 W.Va. 453, 457, 39 S.E. 612, 614 (1901), we held that past practices of various secretaries of state in selling books on credit ran counter to statutory authority and, therefore, could not be condoned because:

"Infinite authority exists for the law proposition that the powers and duties of all governmental officers 'are limited and defined by laws,' by statute where one exists as in this case. It is the sole criterion of authority, and no custom can enlarge or vitiate it. *The Floyd Acceptances,* 7 Wall. 666 [19 L.Ed. 169]. This usage theory was assigned in the case just cited to bind the government to commercial paper accepted by the secretary of war, as it had been the custom for the secretary to make such acceptances; but the court repudiated the doctrine upon the fixed principle that such custom could not prevail against law. The court said that such unauthorized acts by an officer, however frequent, could not stand as a foundation for the authority assumed. Such a practice—I will not call it 'custom or usage'—such a personal practice of individual secretaries, cannot be upheld by this court, because contrary to the plain import of the statute, and calculated to encourage loose official practice entailing loss on the state."

*See also State v. Conley,* 118 W.Va. 508, 190 S.E. 908 (1937); *Beneficial Finance Co. of Landover v. Administrator of Loan Laws,* 260 Md. 430, 272 A.2d 649 (1971);

*State v. Guy,* 196 Neb. 308, 242 N.W.2d 864 (1976); *Schumacher v. State,* 78 Nev. 167, 370 P.2d 209 (1962); *International Harvester Co. v. Town of Ellery,* 28 A.D.2d 1081, 285 N.Y.S.2d 104 (1967); Annot., 65 A.L.R. 811 (1930). This rule is designed to foreclose public officials from acting in disregard of clear and unambiguous statutory procedures by asserting a reliance on some past practice that is contrary to the statute. To permit this type of defense would nullify the plain meaning of a statute.[6]

Hawkins' assertion that he acted in good faith cannot be sustained in this case since he acted in excess of his statutory authority and in violation of the positive command of the City Charter in regard to issuing checks on the City Treasury. The general rule regarding the good faith defense as it relates to public officials is summarized in 63 Am.Jur.2d *Public Officers and Employees* § 299 at 808 (1972):

"[G]ood faith and absence of malice constitute no defense in an action to hold a ministerial officer liable for damages caused by his nonfeasances or misfeasances, for an officer is under a constant obligation to discharge the duties of his office, and it is not necessary to show that his failure to act was wilful or malicious. And this is likewise the rule in respect of officers with discretionary powers who have exceeded their jurisdic-

tion and have acted without authority of law." (Footnotes omitted)[7]

We have much the same law, as found in Syllabus Point 4 of *Clark v. Kelly,* 101 W.Va. 650, 133 S.E. 365 (1926):

"Where the duties imposed upon a public officer are positive and ministerial only and involve no discretion on his part, he is liable to any one injured by his nonperformance or his negligent performance thereof, and this without regard to his motive or any question involving corruption in office; and whether he has properly discharged his duties in the premises is generally a question of fact for the jury on the evidence adduced before them."

In *State v. Conley, supra,* members of a local school board were sued individually for the loss of funds arising from their investment in bonds issued by a private corporation. The investment violated constitutional and statutory provisions relating to investment of public funds. The board members raised the defense of good faith but the Court rejected it, stating:

"The question of good faith is not here involved. The exercise of the utmost good faith cannot serve to create a power not granted by the constitution. The alleged fact that the defendants, in making the loan to the Consolidated Fruit Company, acted in good faith, under what they believed to be their authority and discretion under the constitution and

---

6. In *Bouse v. Hutzler,* 180 Md. 682, 687, 26 A.2d 767, 769 (1942), the court made this distinction regarding this principle:

"It is quite true that where the language of a statute is ambiguous and susceptible of two reasonable constructions, a long and unvarying administrative practice has a very persuasive influence, if not an entirely controlling effect, upon the judicial construction of the statute. But the rule of contemporaneous construction does not preclude an inquiry by the Courts into the correctness of such a construction. Where the language is clear and explicit, and susceptible of a sensible construction, it cannot be controlled by extraneous considerations. No custom, however long and generally it has been followed by officials, can nullify the plain meaning and purpose of a statute."

7. In *Gildea v. Ellershaw,* 363 Mass. 800, 814, 298 N.E.2d 847, 858–59 (1973), the court gave this

summary of the rule regarding a public official's liability where he is required to exercise judgment or discretion:

"[I]f a public officer, other than a judicial officer, is either authorized or required, in the exercise of his judgment and discretion, to make a decision and to perform acts in the making of that decision, and the decision and acts are within the scope of his duty, authority and jurisdiction, he is not liable for negligence or other error in the making of that decision, at the suit of a private individual claiming to have been damaged thereby. This rule is presently limited to public officers acting in good faith, without malice and without corruption."

*See also Graney v. Board of Regents,* 92 Wis.2d 745, 286 N.W.2d 138 (1979); *Mobil Enterprises, Inc. v. Conrad,* 177 Ind.App. 475, 380 N.E.2d 100 (1978).

statutes as interpreted, construed and applied by their predecessors in office, over a long term of years, does not serve to create the asserted power and discretion unless grounds for such interpretation of their powers be found in the constitution itself. If it were otherwise, constitutional provisions would find their interpretation in the understanding and good intent of those acting thereunder." 118 W.Va. at 527, 190 S.E. at 917.

*See also Smith v. Slack*, 125 W.Va. 812, 26 S.E.2d 387 (1943).

In *Martin v. Mullins*, 170 W.Va. 358, 294 S.E.2d 161 (1982), a school board had compromised a 1983 suit, 42 U.S.C. § 1983, brought in federal court by several discharged employees. The board had utilized board funds to pay for the compromise and also its attorney fees. Suit was brought in state court to remove the board for what were contended to be illegal expenditures of the board's funds on the theory that the board members were individually liable in the federal court action. Because the board's payments were in effect a form of indemnification, we discussed the question of good faith in this context.[8] In determining a general standard as to when a public official may assert a "good faith" defense or immunity in order to avoid personal liability, we adopted the federal standard as outlined in *Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980), and

*Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1973), which is generally whether a public official should reasonably have known that his conduct was illegal.[9]

In *Procunier v. Navarette*, 434 U.S. 555, 562, 98 S.Ct. 855, 860, 55 L.Ed.2d 24, 31 (1978), the United States Supreme Court elaborated further on this test:

"Under the first part of the *Wood v. Strickland*, [420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975)] rule, the immunity defense would be unavailing to petitioners if the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known of that right, and if they knew or should have known that the conduct violated the constitutional norm."

And, in *Butz v. Economou*, 438 U.S. 478, 494–95, 98 S.Ct. 2894, 2904–05, 57 L.Ed.2d 895, 908–09 (1978), the Court after reviewing its earlier cases, indicated that liability under 42 U.S.C. § 1983 could be imposed where the official violated "obvious statutory or constitutional limitations on his powers or if his conduct was a manifestly erroneous application of the statute," and made this summary:

"The liability of officials who have exceeded constitutional limits was not confronted in either *Barr* [*v. Matteo*, 360

---

**8.** Syllabus Point 1 of *Martin v. Mullins, supra,* provides:

"The term 'good faith' in the context of a proceeding in state court under state law to determine whether indemnification of a public official for attorneys' fees and personal judgments is appropriate means that the official did not actually know or should not reasonably have known that the actions taken *within the scope of his official responsibility* violated another's constitutional rights. An after-the-fact determination that a violation of rights occurred as a result of official action does not *ipso facto* demonstrate a lack of good faith."

**9.** Syllabus Point 2 of *Martin v. Mullins, supra,* states:

"In general our standard for determining whether a public official acted in 'good faith' for the purposes of indemnification for attorneys' fees and personal judgments is identical to the federal standard for determining whether a public official is entitled to 'good

faith' immunity in a federal civil rights suit. Consequently, we adopt the standards outlined in *Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980) and *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1973) for determining whether a public official 'should reasonably have known' that his conduct was illegal. It is the existence of reasonable grounds for the belief that the official's conduct was legal formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for good faith indemnification. The applicable test focuses not only on whether the official has an objectively reasonable basis for that belief, but also on whether the official himself is acting sincerely and with a belief that he is doing right. The official's belief may be based on state and local law, advice of counsel, administrative practice, or some other factor of which the official alone is aware."

U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959)] or *Spalding* [*v. Vilas*, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896)]. Neither of those cases supports the Government's position. Beyond that, however, neither case purported to abolish the liability of federal officers for actions manifestly beyond their line of duty; and if they are accountable when they stray beyond the plain limits of their statutory authority, it would be incongruous to hold that they may nevertheless willfully or knowingly violate constitutional rights without fear of liability." [10]

In the present case, we believe the long standing charter provision regarding disbursement of funds was a provision that Hawkins should reasonably have known. Moreover, we find it virtually inconceivable that such a fundamental process as the proper procedure for disbursing public funds would not be actually known to the mayor. Thus, when Hawkins issued the check which he had no authority to do under the Charter, he was acting in violation of law. He is not entitled to the good faith defense.

Finally, we decline to address whether Hawkins' action can be excused because he acted on advice of counsel. This issue, at best, goes only to the question of whether he had authority to compromise the Glaspell claim. This was the only question that was posed to the City Attorney. The attorney's response that the mayor had such authority could not in any manner be construed to mean that he also had the authority to violate the charter provisions for issuing checks. It was this latter act on the part of Hawkins that was unlawful and resulted in the check being issued with his signature in lieu of the proper city officials' signatures. This was the act which causes personal liability to accrue.

For the foregoing reasons, we reverse the judgment of the Circuit Court of Mar-

ion County and remand the case for further proceedings consistent with this opinion.

Reversed and Remanded.

---

**10.** The United States Supreme Court in *Butz v. Economou, supra,* gave a limited immunity to federal officials as it had set for state officials in *Scheuer v. Rhodes, supra,* but reaffirmed the absolute immunity extended to judges and pros-ecutors. *E.g., Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Bradley v. Fisher,* 13 Wall 335, 20 L.Ed. 646 (1872).