424 S.E.2d 591

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**CHASE SECURITIES, INC., Defendant and Third–Party Plaintiff Below, Appellant,**

v.

**The WEST VIRGINIA STATE BOARD OF INVESTMENTS; Arch A. Moore, Jr.; Glen B. Gainer, Jr.; and A. James Manchin, Third–Party Defendants Below, Appellees.**

No. 20863.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 22, 1992.

Decided Nov. 25, 1992.

Mary L. Wolff, Wolff Ardis, Memphis, Tenn., Rudolph L. DiTrapano, Rebecca A. Baitty, Debra L. Hamilton, DiTrapano & Jackson, Silas B. Taylor, Sr. Deputy Atty. Gen., Charleston, for appellee State of W.Va.

Joseph R. Goodwin, Richard E. Rowe, Goodwin & Goodwin, Charleston, for appellant.

John R. Hoblitzell, John Andrew Smith, Steven L. Thomas, Kay, Casto, Chaney, Love & Wise, Charleston, for appellee Arch A. Moore, Jr.

David P. Cleek, Kenneth E. Knopf, Stephen M. Fowler, Cleek, Pullin & Bibb, Charleston, for appellee Glen B. Gainer, Jr.

Richard L. Earles, Stephen D. Annand, Shuman, Annand & Poe, Charleston, for appellee A. James Manchin.

MILLER, Justice:

This appeal involves a question of immunity for state executive officials which arose in a civil action by the State of West Virginia against Chase Securities, Inc., (Chase) to recover damages for losses sustained by the Consolidated Fund (Fund)[1] in the spring of 1987. Chase appeals from a September 17, 1991 order of the Circuit Court of Kanawha County which dismissed Chase's third-party complaint against Arch A. Moore, Jr., A. James Manchin, and Glen B. Gainer, Jr., who were the Governor, the Treasurer, and the Auditor, respectively, of this state at the time of the losses in question. By virtue of W.Va.Code, 12–6–3 (1978), these three public officials were members of the State Board of Investments (Board),[2] which managed the Fund. We conclude that the lower court properly ruled that these Board members were immune from suit, and we affirm the dismissal of the third-party complaint.

I.

The basic facts are not disputed by the parties. In the spring of 1987, the Fund suffered substantial portfolio losses. Several New York City brokerage companies, including Chase, had handled the securities transactions that resulted in these losses. Chase had purchased from the Board a sixty-day put option on $100 million in United States Treasury bonds for a premium of over $800,000. The option gave Chase the right to sell the bonds back to the Board for a fixed price at a later date.

During the period of the option, treasury bonds declined substantially in value. Consequently, when Chase exercised its option to have the Board repurchase the bonds, the option price was substantially above

1. The Consolidated Fund is defined in W.Va. Code, 12–6–2(2) (1990); "'Consolidated fund' means the investment fund managed by the board and established pursuant to subsection (b), section eight [§ 12–6–8(b) ] of this article[.]" This provision is identical to the statute in effect at the time this dispute arose. See W.Va.Code, 12–6–2(2) (1983). In addition, W.Va.Code, 12–6–8(b) (1983), states:

"There is hereby also established a special investment fund to be managed by the board and designated as the 'consolidated fund.' The consolidated fund shall consist of a special account for the common investment of state funds designated as the 'state account' and a special account for the common invest- ment of local government funds designated as the 'local government account.' Moneys in both accounts may be combined for the common investment of the consolidated fund on an equitable basis."

2. W.Va.Code, 12–6–3 (1978), provided: "The state board of investments is hereby continued as a body corporate of the State authorized to exercise all of the powers and functions granted to it pursuant to this article. The governor, state treasurer and state auditor shall be the members of the board." In 1989, the legislature expanded the Board to include four additional members to be appointed by the governor. See W.Va.Code, 12–6–3 (1989).

the existing market price. As a result, the Fund sustained a loss of approximately $7.1 million on the transaction.

The State sued Chase in the Circuit Court of Kanawha County on the theory that its agents had caused employees of the Fund to execute the option resulting in the investment losses through the use of inducements and misrepresentations. Chase filed a third-party complaint against the members of the Board, claiming that their approval of the transaction made them equally liable for the loss. Chase argued that if the transaction was in violation of the investment laws, as contended by the State, then the three public officials who approved the transaction were also culpable. In response, the third-party defendants moved to dismiss Chase's complaint, alleging that because they were acting within the scope of their authority in approving the option transaction, they were entitled to immunity from personal liability.

By order dated September 17, 1991, the circuit court granted the motion to dismiss, citing two reasons for its decision. First, the court concluded that "[t]he claims against the third-party defendants are in the nature of defenses to the State's claim against Chase." Second, the circuit court found that the action of the third-party defendants "in executing the Board Authorization for the put option to Chase were discretionary acts within the scope of their authority as members of the Board of Investments." The circuit court went on to state that even if "the transaction was in violation of a state statute and/or Board of Investment guidelines, the third-party defendants are immune from liability absent a showing of willful, malicious or oppressive conduct in approving the transaction."

On appeal, Chase admits that there is no evidence to demonstrate that the members of the Board acted in a willful, malicious manner or were guilty of oppressive conduct. Instead, Chase argues that the Board members are chargeable with the conduct of the Fund's investment employees, which the State characterizes as *ultra vires*[3] and without lawful authority.

We note, however, that the circuit court's decision was not based on an *ultra vires* theory, but rather on an immunity analysis. There is no contention by Chase that the members of the Board did not have the authority to approve the option contract investment. Consequently, we decline to discuss the *ultra vires* argument.

## II.

■ Admittedly, our law with regard to public official immunity is meager. As an initial matter, we make a distinction between the immunity that is available to state executive officials, such as the three individuals involved in this case, and the immunity afforded public officials who are employed by political subdivisions under W.Va.Code, 29–12A–1, *et seq.* This statute is known as the Governmental Tort Claims and Insurance Reform Act, and the immunity conferred therein is not at issue in this case.

Perhaps because of the paucity of our law as to immunity of public officials, the various parties to this appeal have declined to address the immunity issue in any comprehensive fashion. The Board members place principal reliance on *State ex rel. Boone National Bank of Madison v. Manns*, 126 W.Va. 643, 29 S.E.2d 621 (1944), where members of a county commission were sued because they had expended funds in excess of that year's levy. In the course of the opinion, we made this statement:

"No public officer is liable to one dealing with him for the ill-performance of an official act, if he is legally vested with discretion, or must use his own judgment, as to the manner or method of performing such act. Judicial and legislative officers are, accordingly, ordinarily immune from such liability, and are not even required to give bond. Other officers in performing acts which involve official discretion likewise incur no personal liability in the absence of fraud."

**3.** *Ultra vires* means that the action taken was beyond the power or authority given to the actor. *Black's Law Dictionary* 1522 (6th ed. 1990).

126 W.Va. at 647, 29 S.E.2d at 623–24. (Citations omitted).[4]

Under this standard, a public official performing a discretionary act in his or her public capacity is shielded from liability unless he or she is guilty of fraud, malice, or other willful, oppressive conduct. For reasons that we discuss more fully in Part III, *infra*, we do not adopt this standard except as to the fraud, malice, or other oppressive conduct portion.

To determine an appropriate standard for deciding whether a state executive officer is immune from personal liability, we believe it is prudent to consider the development of the law by the United States Supreme Court. There are several cogent reasons that support such an approach.

First, litigation directed at state officials is most frequently brought pursuant to 42 U.S.C. § 1983, which creates a remedy for violation of federal rights committed by persons acting under color of state law.[5] The interpretation of this statute by the federal courts has resulted in a substantial body of law regarding immunity for public officials. This law has developed by considering common law immunity concepts, as the United States Supreme Court observed in *Owen v. City of Independence*, 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673, 685 (1980):

> "In each of these cases, our finding of § 1983 immunity 'was predicated upon a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it.' *Imbler v. Pachtman*, [424 U.S. 409], at 421 [96 S.Ct. 984, 990, 47 L.Ed.2d 128,

138 (1976)]. Where the immunity claimed by the defendant was well established at common law at the time § 1983 was enacted, and where its rationale was compatible with the purposes of the Civil Rights Act, we have construed the statute to incorporate that immunity."[6]

*See also Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). Thus, these precepts are compatible with our common law traditions.

Another reason for utilizing the federal law is the holding in *Howlett v. Rose*, 496 U.S. 356, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990), that in Section 1983 litigation a state may not create an immunity for state officials that is greater than the federal immunity. The Court in *Howlett* pointed out that Section 1983 suits could be brought in state courts[7] and that under the Supremacy Clause, federal substantive law must be applied in such actions. In *Howlett*, the Florida court had held that the state's absolute immunity from suit applied to state governmental entities in Section 1983 actions. In rejecting this contention, the Supreme Court stated:

> "If the District Court of Appeal meant to hold that governmental entities subject to § 1983 liability enjoy an immunity over and above those already provided in § 1983, that holding directly violates federal law. The elements of, and the defenses to, a federal cause of action are defined by federal law." 496 U.S. at 375, 110 S.Ct. at 2442, 110 L.Ed.2d at 353. (Citations omitted).

*See also Felder v. Casey*, 487 U.S. 131, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988); *Mar-*

---

**4.** We are also cited *Utah State University of Agriculture & Applied Science v. Sutro & Co.*, 646 P.2d 715 (Utah 1982), which we discuss in Part III, *infra*.

**5.** This provision was derived from Section 1 of the Civil Rights Act of 1871 and is now codified in 42 U.S.C. § 1983 (1988 ed.), which provides, in relevant part:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . ., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or

immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

**6.** The United States Supreme Court has pointed out that the law of official immunity has developed from common law principles because there is an absence of any applicable Congressional legislation on the subject. *See, e.g., Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982); *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951).

**7.** We recognized as much in *Mitchem v. Melton*, 167 W.Va. 21, 277 S.E.2d 895 (1981).

*tinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). Thus, it would seem appropriate to construct, if possible, an immunity standard that would not conflict with the federal standard.

Furthermore, in several instances, we have used federal official immunity law. For example, in *Martin v. Mullins,* 170 W.Va. 358, 294 S.E.2d 161 (1982), we borrowed from this law to create a right to indemnification for attorney's fees, monetary judgments, and costs incurred by a public official in defending a civil action.[8] It would obviously be anomalous to now ignore federal precedents, particularly in view of Syllabus Point 3 of *Martin.*[9]

Even more analogous, from a substantive law standpoint, is *Bennett v. Coffman,* 178 W.Va. 500, 361 S.E.2d 465 (1987), which involved a civil action for damages against a police officer. We set out in the Syllabus, in part, of *Bennett,* this general test

which comes from *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982):

"Government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[10]

Thus, we conclude that our immunity analysis should begin by exploring applicable federal cases on immunity for public officials in Section 1983 suits.

### III.

Recently, in *Burns v. Reed,* 500 U.S. ——, ——, 111 S.Ct. 1934, 1938–39, 114 L.Ed.2d 547, 557 (1991), the United States Supreme Court made this summary as to its general theory with regard to Section 1983 immunity:

8. Syllabus Points 1 and 2 of *Martin* state:

"1. The term 'good faith' in the context of a proceeding in state court under state law to determine whether indemnification of a public official for attorneys' fees and personal judgments is appropriate means that the official did not actually know or should not reasonably have known that the actions taken within the scope of his official responsibility violated another's constitutional rights. An after-the-fact determination that a violation of rights occurred as a result of official action does not *ipso facto* demonstrate a lack of good faith.

"2. In general our standard for determining whether a public official acted in 'good faith' for the purposes of indemnification for attorneys' fees and personal judgments is identical to the federal standard for determining whether a public official is entitled to 'good faith' immunity in a federal civil rights suit. Consequently, we adopt the standards outlined in *Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980) and *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1973) [1974] for determining whether a public official 'should reasonably have known' that his conduct was illegal. It is the existence of reasonable grounds for the belief that the official's conduct was legal[,] formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for good faith indemnification. The applicable test focuses not only on whether the official has an objectively reasonable basis for that belief, but also on whether the official himself is acting sincerely and with a belief that he is doing right. The

official's belief may be based on state and local law, advice of counsel, administrative practice, or some other factor of which the official alone is aware."

9. Syllabus Point 3 of *Martin* states:

"A federal court determination in a 42 *U.S.C.* 1983 civil rights action that a public official has acted in bad faith is *res judicata* on that issue for purposes of indemnification for personal judgments or attorneys' fees where the holding was an integral part of the decision of the case or controversy before the federal court and all parties were aware or should have been aware of the *res judicata* implications for indemnity purposes of the court decision on bad faith."

10. Even independently of Section 1983 cases, we have not been hesitant to apply United States Supreme Court or lower federal court cases in all manner of other civil rights contexts. *See, e.g., West Virginia Human Rights Comm'n v. Moore,* 186 W.Va. 183, 411 S.E.2d 702 (1991); *Paxton v. Crabtree,* 184 W.Va. 237, 400 S.E.2d 245 (1990); *Benjamin R. v. Orkin Exterminating Co.,* 182 W.Va. 615, 390 S.E.2d 814 (1990); *Independent Fire Co. No. 1. v. West Virginia Human Rights Comm'n,* 180 W.Va. 406, 376 S.E.2d 612 (1988); *Frank's Shoe Store v. West Virginia Human Rights Comm'n,* 179 W.Va. 53, 365 S.E.2d 251 (1986); *State ex rel. State of West Virginia Human Rights Comm'n v. Logan–Mingo Area Mental Health Agency, Inc.,* 174 W.Va. 711, 329 S.E.2d 77 (1985); *Shepherdstown Volunteer Fire Dep't v. State ex rel. West Virginia Human Rights Comm'n,* 172 W.Va. 627, 309 S.E.2d 342 (1983).

"The Court has consistently recognized ... that § 1983 was not meant 'to abolish wholesale all common-law immunities.' *Pierson v. Ray*, 386 U.S. 547, 554 [87 S.Ct. 1213, 1218, 18 L.Ed.2d 288, 295] (1967). The section is to be read 'in harmony with general principles of tort immunities and defenses rather than in derogation of them.' *Imbler v. Pachtman*, 424 U.S. 409, 418 [96 S.Ct. 984, 989, 47 L.Ed.2d 128, 136] (1976); see also [*Tenney*] *v. Brandhove*, 341 U.S. 367, 376 [71 S.Ct. 783, 788, 95 L.Ed. 1019, 1026–27] (1951)."

■ Moreover, in *Burns*, the Court reaffirmed its general rule that ordinarily there is a presumption of a qualified, rather than an absolute,[11] immunity for public executive officials:

"The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties. We have been 'quite sparing' in our recognition of absolute immunity, *Forrester* [*v. White*, 484 U.S. 219] at 224 [108 S.Ct. 538, 542, 98 L.Ed.2d 555, 563 (1988)], and have refused to extend it any 'further than its justification would warrant.' *Harlow* [*v. Fitzgerald*, 457 U.S.] at 811 [102 S.Ct. at

2734, 73 L.Ed.2d at 406]." 500 U.S. at ——, 111 S.Ct. at 1939, 114 L.Ed.2d at 558–59.[12]

The Court in *Westfall v. Erwin*, 484 U.S. 292, 295, 108 S.Ct. 580, 583, 98 L.Ed.2d 619, 625 (1988), gave this explanation as to the rationale for an immunity defense:

"The purpose of such official immunity is not to protect an erring official, but to insulate the decisionmaking process from the harassment of prospective litigation. The provision of immunity rests on the view that the threat of liability will make federal officials unduly timid in carrying out their official duties, and that effective government will be promoted if officials are freed of the costs of vexatious and often frivolous damages suit. *See Barr v. Matteo*, [360 U.S. 564] at 571 [79 S.Ct. 1335, 1339, 3 L.Ed.2d 1434, 1441 (1959)]; *Doe v. McMillan*, 412 U.S. 306, 319 [93 S.Ct. 2018, 2028, 36 L.Ed.2d 912, 924–25 (1973)]." [13]

The preeminent test of a public official's immunity was set out in *Harlow v. Fitzgerald, supra,* which grants a qualified, rather than an absolute, immunity. As earlier pointed out, *Harlow* was the basis for this Court's ruling in *Bennett v. Coffman, supra.*[14] In *Harlow*, Mr. Fitzgerald, a civil-

**11.** Absolute immunity for judges has been recognized by the Supreme Court and was recently summarized in *Mireles v. Waco*, 502 U.S. ——, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991). State legislatures are given an absolute immunity for actions that are taken in the sphere of legitimate legislative activity. *See Supreme Court of Virginia v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980); *Tenney v. Brandhove, supra.*

**12.** The reason for the sparing use of absolute immunity was explained in *Westfall v. Erwin*, 484 U.S. 292, 295–96, 108 S.Ct. 580, 583, 98 L.Ed.2d 619, 625 (1988):

"This Court always has recognized, however, that official immunity comes at a great cost. An injured party with an otherwise meritorious tort claim is denied compensation simply because he had the misfortune to be injured by a federal official. Moreover, absolute immunity contravenes the basic tenet that individuals be held accountable for their wrongful conduct. We therefore have held that absolute immunity for federal officials is justified only when 'the contributions of immunity to effective government in particular contexts outweigh the perhaps recurring harm to

individual citizens.' *Doe v. McMillan*, [412 U.S. 306] at 320 [93 S.Ct. 2018, 2028, 36 L.Ed.2d 912, 925 (1973)]." (Footnote omitted).

**13.** In note 3 of *Westfall*, 484 U.S. at 296, 108 S.Ct. at 583, 98 L.Ed.2d at 625, the Supreme Court gave this formulation as to its inquiry on an immunity question:

"In determining the propriety of shielding an official from suit under the circumstances, this Court has long favored a 'functional' inquiry—immunity attaches to particular official functions, not to particular offices. See, e.g., *Forrester v. White*, [484 U.S. 219] at 224 [108 S.Ct. 538, 542, 98 L.Ed.2d 555, 563 (1988)]; *Harlow v. Fitzgerald*, 457 U.S. [at] 811–812 [102 S.Ct. at 2734–35, 73 L.Ed.2d at 406]; *Doe v. McMillan*, 412 U.S., at 319–320 [93 S.Ct. at 2018, 2028, 36 L.Ed.2d 912, 924–25 (1973)]; *Barr v. Matteo*, 360 U.S. 564, 572–573 [79 S.Ct. 1335, 1340, 3 L.Ed.2d 1434, 1442] (1959)...."

**14.** We find the Syllabus of *Bennett v. Coffman, supra,* to be overbroad to the extent that it purports to apply to all public officials. Clearly,

ian employee of the Department of the Air Force, was discharged after he testified about cost overruns before a Congressional committee. The firing was found to violate civil service regulations. Mr. Fitzgerald sued two senior aides and advisers to the President, claiming that they had participated in a conspiracy to violate his constitutional and statutory rights.[15] The Court in *Harlow* relied on two of its earlier cases, i.e., *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), which involved a suit against the Secretary of Agriculture, and *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), which dealt with a state governor, and came to this qualified immunity test:

> "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. at 818, 102 S.Ct. at 2738, 73 L.Ed.2d at 410. (Citations omitted).

To recast the *Harlow* test, a public official may be found personally liable for his or her official acts if it is shown that the official, in the exercise of discretionary powers, has injured a party through the violation of clearly established statutory or constitutional rights of which a reasonable person would have known.[16] The official may escape liability by showing that the statutory or constitutional right[17] was not so clearly established that a reasonable official would have been aware of it.

Thus, the immunity established under *Harlow* and its predecessors is a qualified immunity for executive officials, which is to be distinguished from the absolute immunity conferred on judges and legislators.[18] The Court in *Harlow* observed that this immunity can be termed "good faith" immunity.[19] However, we believe that the more appropriate term is "qualified immunity." The use of the words "good faith" tends to imply that the public official's motives should be examined. This type of subjective analysis was expressly rejected in *Harlow*.

There is, however, a lack of clear authority from the United States Supreme Court in defining some of the elements of this test. Most significant is the absence of a detailed definition of the meaning of the term "discretionary act" and a discussion of its impact on the immunity question. At common law the term "discretionary act" is linked to the term "ministerial act." In *Prosser & Keeton on Torts*, the substantial difference, for immunity purposes, between a discretionary and a ministerial act at common law is discussed, and this conclusion is reached: "Since most states afford a qualified, malice-destructible immunity for discretionary acts, but no immunity at all for 'ministerial' acts, the distinction between the two is critical in any case where the plaintiff cannot show malice."[20] *Prosser*

---

the immunity in *Bennett* is a qualified immunity, and, as earlier noted, some public officials are entitled to an absolute immunity. *See* note 11, *supra*. We also point out again that the legislature has created statutory immunity for local political subdivisions and their officials in W.Va.Code, 29–12A–1, *et seq.* We do not address in this opinion this statute or its effect on the holding in *Bennett*.

**15.** In a companion suit, *Nixon v. Fitzgerald, supra,* the same claim was made against President Nixon. The Supreme Court found the President was entitled to absolute immunity.

**16.** The term "reasonable person" has been taken to mean a reasonable public official occupying the same position as the defendant public official. *See Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Malley v. Briggs, supra.*

**17.** The phrase "constitutional or statutory rights" is not to be thought of as a term of limitation. Violation of administrative rules and regulations are included. *See Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

**18.** *See* note 11, *supra*.

**19.** "Qualified or 'good faith' immunity is an affirmative defense that must be pleaded by a defendant official." 457 U.S. at 815, 102 S.Ct. at 2736, 73 L.Ed.2d at 408. (Citations omitted).

**20.** *Prosser & Keeton's* analysis, like most state courts, discusses official immunity without any consideration of the United States Supreme Court's study of public official immunity law.

& *Keeton on Torts* § 132 at 1062 (5th ed. 1984).

We referred to the definition of "ministerial act" in *City of Fairmont v. Hawkins*, 172 W.Va. 240, 304 S.E.2d 824 (1983). There, the mayor had settled a property damage claim filed against the city and had signed the check. This action was expressly contrary to provisions of the city charter, which gave no authority to the mayor to draw checks on the city treasury and required approval from city council. We quoted Syllabus Point 4 from *Clark v. Kelly*, 101 W.Va. 650, 133 S.E. 365 (1926):

> " 'Where the duties imposed upon a public officer are positive and ministerial only and involve no discretion on his part, he is liable to any one injured by his nonperformance or his negligent performance thereof, and this without regard to his motive or any question involving corruption in office; and whether he has properly discharged his duties in the premises is generally a question of fact for the jury on the evidence adduced before them.' " 172 W.Va. at 245, 304 S.E.2d at 829.

Significantly, in *Hawkins*, we cited *Martin v. Mullins, supra*, for the proposition that:

> "In determining ... when a public official may assert a 'good faith' defense or immunity in order to avoid personal liability, we adopted the federal standards as outlined in *Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980), and *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), which is generally whether a public official should reasonably have known that his conduct was illegal." 172 W.Va. at

246, 304 S.E.2d at 830. (Footnote omitted).

In *Hawkins*, we did not turn our decision on whether the mayor's act was ministerial or discretionary, but concluded that because the "long standing charter provision regarding disbursement of funds was a provision that Hawkins should reasonably have known[,] ... he was acting in violation of law. He is not entitled to the good faith defense." 172 W.Va. at 247, 304 S.E.2d at 831. Thus, in *Hawkins*, we essentially applied the *Harlow* qualified immunity test to determine the personal liability of a public official.

We recognize that there are both state and federal Court of Appeals cases that appear to rely on the distinction between discretionary and ministerial acts in determining the immunity of a public official, but we find them unpersuasive.[21] Several state courts have adopted a definition of "ministerial act" similar to that found in Section 208(c) of 67 C.J.S. *Officers* (1978 & Supp.1992): "[A] public official's duty is ministerial when it is absolute, certain, and imperative, involving merely the execution of a set task, and when the law which imposes it prescribes and defines the time, mode, and occasion of its performance with such certainty that nothing remains for judgment or discretion." *See Glickman v. Glasner*, 230 Cal.App.2d 120, 40 Cal.Rptr. 719 (1964); *State ex rel. Eli Lilly & Co. v. Gaertner*, 619 S.W.2d 761 (Mo.App.1981); *Lister v. Board of Regents*, 72 Wis.2d 282, 240 N.W.2d 610 (1976); *Oyler v. State*, 618 P.2d 1042 (Wyo.1980).[22] Courts that use the ministerial act concept hold that a public official has no immunity for his ministerial acts. However, commentators ac-

---

**21.** While looking at whether the official's act is either ministerial or discretionary, the federal cases contain no meaningful discussion of these terms. *See, e.g., Kaminsky v. Rosenblum*, 929 F.2d 922 (2d Cir.1991); *McIntyre v. Portee*, 784 F.2d 566 (4th Cir.1986); *Boretti v. Wiscomb*, 930 F.2d 1150 (6th Cir.1991).

**22.** Several jurisdictions have adopted the seven-point balancing test set out in Comment *f* of Section 895D of the *Restatement (Second) of Torts*. *See, e.g., Barnes v. Dale*, 530 So.2d 770 (Ala.1988); *James v. Prince George's County*, 288 Md. 315, 418 A.2d 1173 (1980); *Loran v. Iszler*,

373 N.W.2d 870 (N.D.1985); *National Bank of S.D. v. Leir*, 325 N.W.2d 845 (S.D.1982). Section 895D(3) gives absolute immunity to public officials performing discretionary acts:

> "A public officer acting within the general scope of his authority is not subject to tort liability for an administrative act or omission if
> (a) he is immune because engaged in the exercise of a discretionary function[.]"

This principle is inconsistent with the qualified immunity standard set out in *Harlow*.

knowledge that it is virtually impossible to make any clear distinction between a public official's discretionary and ministerial acts.[23]

It is obvious that an immunity standard for a public official needs to encompass all types of public official liability, not just the range of cases covered by Section 1983 suits. It has been said that Section 1983 essentially creates tort liability. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Monell v. Department of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Paxton v. Crabtree*, 184 W.Va. 237, 400 S.E.2d 245 (1990). Consequently, the thrust of any attempt to establish liability against a public official is the violation of some duty attendant to the official's office and a resulting harm to the plaintiff. This analysis essentially adopts the common law tort concept that liability results from the violation of a duty owed which was a proximate cause of the plaintiff's injury. *See, e.g., Parsley v. General Motors Acceptance Corp.*, 167 W.Va. 866, 280 S.E.2d 703 (1981);[24] *Atkinson v. Harman*, 151 W.Va. 1025, 158 S.E.2d 169 (1967).[25] The one difference in immunity cases is that the official's act must be shown to have violated clearly established law of which a reasonable person would have known. The concept of a reasonable person is not entirely foreign to common law principles of negligence.[26]

As we have already noted, we find the discretionary-ministerial act distinction highly arbitrary and difficult to apply. Certainly, the United States Supreme Court has not made any attempt to explain this distinction in Section 1983 cases. Moreover, we find that this distinction is not needed in order to apply the general qualified immunity standard developed in *Harlow:* the official will not be personally liable for his or her official acts if it is shown that his or her conduct did not violate clearly established law of which a reasonable official would have known.

Application of the *Harlow* rule will ordinarily have the same effect as the invocation of the "ministerial acts" principle followed elsewhere. Ministerial acts, by definition, are official acts which, under the law, are so well prescribed, certain, and imperative that nothing is left to the public official's discretion. Obviously, a public official who ignores or violates such clearly established precepts of the law, as did the mayor in *Hawkins, supra,* would not be entitled to qualified immunity under *Harlow* and would be personally liable for his or her nonperformance or misperformance of such acts.

 Thus, we conclude that a public executive official who is acting within the scope of his authority and is not covered by the provisions of W.Va.Code, 29–12A–1, *et seq.,* is entitled to qualified immunity from personal liability for official acts if the

---

**23.** This is acknowledged in Comment *f* to Section 895D of the *Restatement (Second) of Torts:* "It should thus be apparent that in a tort action against a public officer the court has the responsibility of determining not only whether he was engaged in exercising a discretionary function but also, if he is, how extensively this circumstance should work in his defense. There is no single test. Attempts to solve the problem by setting forth a precise definition of the term, discretionary function, have been less than helpful. The expression is not only a standard (see Comment *d* ); it is also a legal conclusion whose purport is only somewhat incidentally related to the definitions of the two words composing it." *See Prosser & Keeton, supra.*

**24.** Syllabus Point 1 of *Parsley* states: "In order to establish a *prima facie* case of negligence in West Virginia, it must be shown that the defendant has been guilty of some act or omission in

violation of a duty owed to the plaintiff. No action for negligence will lie without a duty broken."

**25.** Syllabus Point 1 of *Atkinson* states:

" 'To recover in an action based on negligence the plaintiff must prove that the defendant was guilty of primary negligence and that such negligence was the proximate cause of the injury of which the plaintiff complains.' Point 3, Syllabus, *Alexander v. Jennings,* 150 W.Va. 629 [149 S.E.2d 213 (1966) ]."

**26.** In *Pack v. Van Meter,* 177 W.Va. 485, 494, 354 S.E.2d 581, 590 (1986), we said: "We have customarily defined negligence as 'conduct unaccompanied by that degree of consideration attributable to the man of ordinary prudence under like circumstances.' Syllabus Point 4, in part, *Patton v. City of Grafton,* 116 W.Va. 311, 180 S.E. 267 (1935)."

involved conduct did not violate clearly established laws of which a reasonable official would have known.[27] There is no immunity for an executive official whose acts are fraudulent, malicious, or otherwise oppressive. To the extent that *State ex rel. Boone National Bank of Madison v. Manns, supra,* is contrary, it is overruled.

With regard to the immunity defense in this case, we do not make any distinction between the Governor, the Treasurer, and the Auditor. It may well be that the Governor has broader executive responsibilities than the other two officials. However, the United States Supreme Court in *Scheuer v. Rhodes, supra,* extended only a qualified immunity to the Governor of Ohio in a Section 1983 case.[28] As we have earlier pointed out, our immunity test is designed to parallel the Supreme Court's standard of qualified immunity for public officials in Section 1983 actions because in such actions we cannot extend a broader immunity.[29]

### IV.

■ Turning to the facts of this case, we find that the circuit court's dismissal of the third-party complaint against the members

of the Board was correct.[30] From a procedural standpoint, the United States Supreme Court in *Harlow v. Fitzgerald, supra,* has stressed that insubstantial suits against public officials should be disposed of prior to trial. In note 35 of *Harlow,* 457 U.S. at 819–20, 102 S.Ct. at 2739, 73 L.Ed.2d at 411, the Supreme Court referred to its earlier statement from *Butz v. Economou, supra:*

"In *Butz,* we admonished that 'insubstantial' suits against high public officials should not be allowed to proceed to trial. 438 U.S., at 507 [98 S.Ct. at 2911, 57 L.Ed.2d at 916]. *See* Schuck, [*Suing Our Servants: The Court, Congress, and the Liability of Public Officials for Damages,* 1980 S.Ct.Rev. 281] at 324, 327. We reiterate this admonition. Insubstantial lawsuits undermine the effectiveness of government as contemplated by our constitutional structure, and 'firm application of the Federal Rules of Civil Procedure' is fully warranted in such cases. 438 U.S., at 508 [98 S.Ct. at 2911, 57 L.Ed.2d at 917]."

*See also Anderson v. Creighton,* 483 U.S. 635, 646–47 n. 6, 107 S.Ct. 3034, 3042 n. 6, 97 L.Ed.2d 523, 535–36 n. 6 (1987).

---

**27.** As an illustration, if a public official is operating a motor vehicle as a part of his official duties and injures someone, the violation of established motor vehicle statutes would render him liable to the same extent as the ordinary person. The official, like a private citizen, is reasonably expected to know and obey the motor vehicle laws. Other jurisdictions have reached this result by describing driving as a ministerial act. *See, e.g., James v. Prince George's County, supra; Hansley v. Tilton,* 234 N.C. 3, 65 S.E.2d 300 (1951); *Wynn v. Gandy,* 170 Va. 590, 197 S.E. 527 (1938).

**28.** It is, of course, possible for the legislature to create an immunity for state executive officials that would supplant the test formulated in this case.

**29.** No argument is advanced by the members of the Board that they are entitled to the benefit of the State's constitutional immunity under Section 35 of Article VI of the West Virginia Constitution. We have recognized that this provision confers immunity from liability on the State and its agencies in civil actions for damages. *See Mellon–Stuart Co. v. Hall,* 178 W.Va. 291, 359 S.E.2d 124 (1987); *Hesse v. State Soil Conservation Comm.,* 153 W.Va. 111, 168 S.E.2d 293

(1969). In *Ables v. Mooney,* 164 W.Va. 19, 264 S.E.2d 424 (1979), we recognized that Article VI, Section 35 of the Constitution does not prohibit actions against state officials, but held that where suit was essentially brought against the State, our constitutional immunity would apply. The United States Supreme Court has recognized that the States have immunity under the Eleventh Amendment to the United States Constitution in Section 1983 actions in federal courts, unless the State waives this protection. *See Welch v. Texas Dep't of Highways & Public Transp.,* 483 U.S. 468, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987). Whether a public official may claim Eleventh Amendment immunity in federal court in a Section 1983 suit is determined by the "personal-official capacity" test, which was most recently discussed in *Hafer v. Melo,* 502 U.S. ——, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).

**30.** While a motion to dismiss was used as the vehicle to bring the issue before the circuit court, it appears that the court had the benefit of discovery materials filed in the case. In this sense, the motion to dismiss may be likened to a summary judgment. *See, e.g., United States Fidelity & Guar. Co. v. Hathaway,* 183 W.Va. 165, 394 S.E.2d 764 (1990); *Chapman v. Kane,* 160 W.Va. 530, 236 S.E.2d 207 (1977).

The viability of the third-party complaint must be tested by whether the members of the Board, in approving the option contract, violated clearly established law of which a reasonable public official would have known. Clearly, the Board had the authority to approve and make investments. Chase does not cite any statute that forbids the option contract.[31] Indeed, as part of its *"ultra vires"* argument, Chase concedes in its brief that "the Board had the power to sell put options on United States Treasury notes, and questions of 'speculation' and prudence go to the manner of performance rather than the power to act. Since the put option transactions were permissible investments within the Board's powers, the transactions cannot be *ultra vires.*"

Under this set of facts, we do not find any violation of a clearly established law. There is no question that the Board members were acting in their official capacities. Thus, they were entitled to qualified immunity as a matter of law.

The Utah Supreme Court in *Utah State University of Agriculture & Applied Science v. Sutro & Co.*, 646 P.2d 715 (Utah 1982), had a similar case. There, the University brought suit against securities dealers for investment losses. The securities dealers, in turn, brought a third-party complaint against the members of the University's investment council. The trial court granted a motion to dismiss the third-party suit. On appeal, the Utah Supreme Court, without any extensive discussion of authorities, came to this conclusion:

"The generally recognized doctrine of law is that public officials are protected by a qualified immunity from suits growing out of the performance of lawfully authorized discretionary duties, so long as they are acting in good faith and are not guilty of any willful or intentional wrongdoing.[16]

---

[16] See, e.g., *Barr v. Matteo*, 360 U.S. 564, 575, 79 S.Ct. 1335, 1341, 3 L.Ed.2d 1434 [1443–44] (1959); *Smith v. Losee*, 485 F.2d 334, at 343–344 ([10th Cir.] 1973). Eminent authorities in accord, Prosser, The Law of Torts, § 132; 4 McQuillan, Municipal Corporations, § 12.208." 646 P.2d at 721.

From a factual standpoint, the court found that the public officials had not acted in bad faith nor committed any intentional wrong and affirmed the dismissal of the third-party complaint.

While we do not subscribe to the test used by the Utah court, we believe that under the *Harlow* test the result in this case is the same. There was no showing here that the Board members violated well established principles of law of which a reasonable public official would have known. Consequently, we affirm the circuit court's dismissal of Chase's third-party complaint.

## V.

For the foregoing reasons, the judgment of the Circuit Court of Kanawha County is affirmed.

Affirmed.

---

31. It appears that the Board had adopted the following guideline with regard to option contracts:

"The Treasurer of the State, as staff agency for the Board, shall be authorized to invest in financial futures contracts, options and other similar instruments for the sole purpose of performing hedges in order to reduce the risk associated with fluctuations in interest rates or market prices of investments made by the Board. Such investments shall be limited to direct obligations of, or obligations guaranteed as to the payment of both principal and interest by the United States of America; namely, treasury bills, notes and bonds. For purposes of this guideline, the word 'hedge' means taking a position in the futures market which is opposite and approximately equal to the one held in the cash market. This policy guideline shall only be used as a defensive strategy in order to protect the overall values of our portfolios. Advance unanimous approval of the Board must be obtained prior to each transaction enacted under this guideline."

Chase does not argue these guidelines were not followed.