IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2022 Term

_____

No. 21-0174

_____

FILED

May 20, 2022

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

RONALD C. AYERSMAN AND RONALD C. "MACKEY" AYERSMAN,
ASSISTANT STATE FIRE MARSHAL,
Defendants Below, Petitioners

v.

TAMMY S. WRATCHFORD AND MICHAEL W. WRATCHFORD,
Plaintiffs below, Respondents

_____

AND

_____

No. 21-0181

_____

WEST VIRGINIA STATE FIRE MARSHAL'S OFFICE,
Defendant Below, Petitioner

v.

TAMMY S. WRATCHFORD AND MICHAEL W. WRATCHFORD,
Plaintiffs Below, Respondents.

_____

Appeals from the Circuit Court of Hardy County
The Honorable H. Charles Carl, III, Judge
Case No. CC-16-2018-C-3

AFFIRMED

_____

Submitted: March 15, 2022
Filed: May 20, 2022

Shawn A. Morgan, Esq.
Susan L. Deniker, Esq.
Jeffrey M. Cropp, Esq.
Steptoe & Johnson PLLC
Bridgeport, West Virginia
Counsel for Petitioners Ronald C.
Ayersman and Ronald C. "Mackey"
Ayersman

Lou Ann S. Cyrus, Esq.
Shuman McCuskey & Slicer, PLLC
Charleston, West Virginia
Michael D. Dunham, Esq.
Shuman McCuskey & Slicer, PLLC
Winchester, Virginia
Counsel for Petitioner West Virginia State
Fire Marshal's Office

J. David Judy, III, Esq.
Judy & Judy Attorneys at Law
Moorefield, West Virginia
Counsel for Respondents Tammy S.
Wratchford and Michael W. Wratchford

JUSTICE WOOTON delivered the Opinion of the Court.

JUSTICE BUNN, deeming herself disqualified, did not participate in the decision of this case.

SYLLABUS BY THE COURT

1.	"'This Court reviews *de novo* the denial of a motion for summary judgment, where such a ruling is properly reviewable by this Court.' Syl. Pt. 1, *Findley v. State Farm Mut. Auto. Ins. Co.*, 213 W.Va. 80, 576 S.E.2d 807 (2002)." Syl. Pt. 1, *W. Va. Reg'l Jail & Corr. Facility Auth. v. A.B.*, 234 W. Va. 492, 766 S.E.2d 751 (2014).

2.	"A circuit court's denial of summary judgment that is predicated on qualified immunity is an interlocutory ruling which is subject to immediate appeal under the 'collateral order' doctrine." Syl. Pt. 2, *Robinson v. Pack*, 223 W. Va. 828, 679 S.E.2d 660 (2009).

3.	"A circuit court's entry of summary judgment is reviewed *de novo*." Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994).

4.	"If a public officer is either authorized or required, in the exercise of his judgment and discretion, to make a decision and to perform acts in the making of that decision, and the decision and acts are within the scope of his duty, authority, and jurisdiction, he is not liable for negligence or other error in the making of that decision, at the suit of a private individual claiming to have been damaged thereby." Syl. Pt. 4, *Clark v. Dunn*, 195 W. Va. 272, 465 S.E.2d 374 (1995).

5. "In the absence of an insurance contract waiving the defense, the doctrine of qualified or official immunity bars a claim of mere negligence against a State agency not within the purview of the West Virginia Governmental Tort Claims and Insurance Reform Act, W.Va. Code § 29-12A-1, *et seq.*, and against an officer of that department acting within the scope of his or her employment, with respect to the discretionary judgments, decisions, and actions of the officer." Syl. Pt. 6, *Clark v. Dunn*, 195 W. Va. 272, 465 S.E.2d 374 (1995).

6. "To determine whether the State, its agencies, officials, and/or employees are entitled to immunity, a reviewing court must first identify the nature of the governmental acts or omissions which give rise to the suit for purposes of determining whether such acts or omissions constitute legislative, judicial, executive or administrative policy-making acts or involve otherwise discretionary governmental functions. To the extent that the cause of action arises from judicial, legislative, executive or administrative policy-making acts or omissions, both the State and the official involved are absolutely immune pursuant to Syl. Pt. 7 of *Parkulo v. W. Va. Bd. of Probation and Parole*, 199 W.Va. 161, 483 S.E.2d 507 (1996)." Syl. Pt. 10, *W. Va. Reg'l Jail & Corr. Facility Auth. v. A.B.*, 234 W. Va. 492, 766 S.E.2d 751 (2014).

7. "To the extent that governmental acts or omissions which give rise to a cause of action fall within the category of discretionary functions, a reviewing court must determine whether the plaintiff has demonstrated that such acts or omissions are in

violation of clearly established statutory or constitutional rights or laws of which a reasonable person would have known or are otherwise fraudulent, malicious, or oppressive in accordance with *State v. Chase Securities, Inc*., 188 W.Va. 356, 424 S.E.2d 591 (1992). In absence of such a showing, both the State and its officials or employees charged with such acts or omissions are immune from liability." Syl. Pt. 11, *W. Va. Reg'l Jail & Corr. Facility Auth. v. A.B.*, 234 W. Va. 492, 766 S.E.2d 751 (2014).

8. "The ultimate determination of whether qualified or statutory immunity bars a civil action is one of law for the court to determine. Therefore, unless there is a bona fide dispute as to the foundational or historical facts that underlie the immunity determination, the ultimate questions of statutory or qualified immunity are ripe for summary disposition." Syl. Pt. 1, *Hutchison v. City of Huntington*, 198 W. Va. 139, 479 S.E.2d 649 (1996).

9. "'The public policy favors prosecution for crimes and requires the protection of a person who in good faith and upon reasonable grounds institutes proceedings upon a criminal charge. The legal presumption is that every prosecution for crime is founded upon probable cause and is instituted for the purpose of justice.' Syllabus Point 4, *McNair v. Erwin*, 84 W.Va. 250, 99 S.E. 454 (1919)." Syl. Pt. 3, *Jarvis v. W. Va. State Police*, 227 W. Va. 472, 711 S.E.2d 542 (2010).

10.     "[A] grand jury indictment is prima facie evidence of probable cause for the underlying criminal prosecution, and a plaintiff may rebut this evidence by showing that the indictment was procured by fraud, perjury, or falsified evidence." Syl. Pt. 5, in part, *Jarvis v. W. Va. State Police*, 227 W. Va. 472, 711 S.E.2d 542 (2010).

11.     "Probable cause in [a] malicious prosecution action is a mixed question of law and fact; where facts are admitted or assumed, it is a question of law in [a] malicious prosecution action whether they constitute probable cause." Syl. Pt. 3, *Staley v. Rife*, 109 W. Va. 701, 156 S.E. 113 (1930).

12.     "In a civil action for malicious prosecution, the issues of malice and probable cause become questions of law for the court where the evidence pertaining thereto is without conflict, or, though conflicting in some respects, is of such nature that only one inference may be drawn therefrom by reasonable minds." Syl. Pt. 7, *Truman v. Fid. & Cas. Co. of N.Y.*, 146 W. Va. 707, 123 S.E.2d 59 (1961).

13.     "If the plaintiff identifies a clearly established right or law which has been violated by the acts or omissions of the State, its agencies, officials, or employees, or can otherwise identify fraudulent, malicious, or oppressive acts committed by such official or employee, the court must determine whether such acts or omissions were within the scope of the public official or employee's duties, authority, and/or employment. To the extent that such official or employee is determined to have been acting outside of the scope

iv

of his duties, authority, and/or employment, the State and/or its agencies are immune from vicarious liability, but the public employee or official is not entitled to immunity in accordance with *State v. Chase Securities, Inc.*, 188 W.Va. 356, 424 S.E.2d 591 (1992) and its progeny. If the public official or employee was acting within the scope of his duties, authority, and/or employment, the State and/or its agencies may be held liable for such acts or omissions under the doctrine of *respondeat superior* along with the public official or employee." Syl. Pt. 12, *W. Va. Reg'l Jail & Corr. Facility Auth. v. A.B.*, 234 W. Va. 492, 766 S.E.2d 751 (2014).

14. "'To establish prima facie proof of tortious interference, a plaintiff must show: (1) existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages. If a plaintiff makes a prima facie case, a defendant may prove justification or privilege, affirmative defenses. Defendants are not liable for interference that is negligent rather than intentional, or if they show defenses of legitimate competition between plaintiff and themselves, their financial interest in the induced party's business, their responsibility for another's welfare, their intention to influence another's business policies in which they have an interest, their giving of honest, truthful requested advice, or other factors that show the interference was proper.' Syllabus Point 2, *Torbett v. Wheeling Dollar Sav. & Trust Co.*, 173 W.Va. 210, 314 S.E.2d 166 (1983)." Syl. Pt. 5, *Hatfield v. Health Mgmt. Assocs. of W. Va.*, 223 W. Va. 259, 672 S.E.2d 395 (2008).

15.    "In the context of tortious interference with a business relationship, one who intentionally causes a third person not to perform a contract or not to enter into a prospective business relation with another does not interfere improperly with the other's business relation by giving the third person (a) truthful information, or (b) honest advice within the scope of a request for the advice. Restatement (Second) of Torts § 722 (1979)." Syl. Pt. 5, *Tiernan v. Charleston Area Med. Ctr., Inc*., 203 W. Va. 135, 506 S.E.2d 578 (1998).

WOOTON, Justice:

These consolidated appeals stem from an investigation into a suspicious fire that damaged the home of Tammy and Michael Wratchford (hereinafter "the Wratchfords" or "Respondents"). Petitioner Ronald C. Ayersman ("Mr. Ayersman"), in his official capacity as an assistant state fire marshal, investigated the fire on behalf of Petitioner West Virginia State Fire Marshal's Office ("WVSFMO"). Upon completion of his investigation, Mr. Ayersman concluded that the fire was caused by arson allegedly committed by Ms. Wratchford. A grand jury declined to indict Ms. Wratchford. Thereafter she and Mr. Wratchford sued the WVSFMO and Mr. Ayersman in his personal and official capacities, alleging, among other things, negligence, violations of the West Virginia Governmental Ethics Act ("Ethics Act"),[1] and tortious interference.

Mr. Ayersman and the WVSFMO moved for summary judgment, each asserting they were entitled to qualified immunity. The circuit court denied, in part, both motions upon finding that several genuine disputes of material fact remained which may defeat immunity. Mr. Ayersman and the WVSFMO appealed the rulings separately, and this Court consolidated those appeals for purposes of argument and decision. Because we find that the circuit court correctly denied, in part, the motions for summary judgment on the ground that there remained outstanding issues of material fact, we affirm.

---

[1] *See* W. Va. Code §§ 6B-1-1 to -3-11 (2019).

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

On February 20, 2017, the home of Michael and Tammy Wratchford was damaged by a fire which burned the basement stairs and a small portion of the kitchen floor (hereinafter the "Wratchford fire"). The Moorefield Volunteer Fire Department ("VFD")[2] responded to the fire, at which time the chief of the VFD, Doug Mongold, examined the scene and opined that the fire may have been caused by faulty electrical wiring. Mr. Mongold later testified in a deposition that he observed damaged wiring and burn marks at the scene that supported this conclusion, though he was ultimately unable to pinpoint the exact cause of the fire.

The Wratchfords maintained a fire insurance policy through Erie Insurance Property and Casualty Company ("Erie"). When faced with a fire insurance claim, Erie contracts with private companies to investigate the origin and cause of the structural fires underlying the claim. With regard to the Wratchford fire, Erie contracted with Fire & Safety Investigation Consulting Services, LLC ("FSI"), which investigates fires in Maryland, Pennsylvania, and West Virginia. The owner of FSI, Brent Harris, personally investigated the Wratchford fire and initially believed the fire to have been "incendiary," or intentionally set. However, Mr. Harris recommended to Erie that an electrical engineer examine the site to determine whether faulty wiring may have been the cause of the fire.

---

[2] Mr. and Mrs. Wratchford are both members of the VFD, though neither was working in their volunteer capacity at the time of the fire.

2

At the same time, Mr. Harris contacted the WVSFMO to request that they investigate the fire as a potential arson.

Before further discussing the facts surrounding the Wratchford fire, we must take a brief detour to discuss a matter at the heart of this appeal: the dual employment of the investigating assistant fire marshal, Mr. Ayersman. Mr. Ayersman joined the WVSFMO as an assistant fire marshal in 1994 and presently remains in that employ. In January 2010, Mr. Ayersman took a second job as a part-time fire investigator for FSI. Recognizing there may be a potential conflict in working for both the WVSFMO and a *private* entity that investigates fires in West Virginia, Mr. Ayersman submitted a "Request for Determination Regarding Secondary Employment or Voluntary Activity" to the WVSFMO. In his request, Mr. Ayersman stated that he would only investigate fires in West Virginia for the WVSFMO, and that he would limit his investigations for FSI to fires that occurred in Maryland and Pennsylvania. Based on this information, Mr. Ayersman's supervisor determined that his dual employment created no conflict.[3] With this in mind, we return to the events surrounding the Wratchford fire.

---

[3] Despite this determination, we are mindful that a full review of the record reveals that Mr. Ayersman frequently logged hours as an employee of *both* the WVSFMO and FSI on the same days, which must inherently overlap. This is so, because on more than one occasion Mr. Ayersman logged more than twenty-four billable hours of work in a single day, and because on several days he logged no mileage travelled for his work with FSI.

3

On February 23, 2017, Mr. Harris contacted the WVSFMO to request an investigation of the fire. The facts surrounding this initial contact are somewhat unclear from the record, but it appears Mr. Harris directly contacted Mr. Ayersman in his official capacity as an assistant fire marshal to request the investigation. During this conversation, Mr. Harris expressed to Mr. Ayersman his belief that the Wratchford fire had been intentionally set, and that he had ruled out all accidental causes of the fire. After this conversation Mr. Harris also contacted the WVSFMO Arson Hotline to request an investigation of the Wratchford fire as a possible arson.

Once the request was made to the WVSFMO, George Harms,[4] Mr. Ayersman's direct supervisor, assigned the investigation of the Wratchford fire to Mr. Ayersman. There is substantial disagreement amongst the parties as to how Mr. Ayersman received this assignment, but the uncontroverted testimony of both Mr. Ayersman and Mr. Harms is that Mr. Ayersman was assigned the investigation simply because he had a lesser workload than other WVSFMO employees.[5] We would note, however, that Mr. Ayersman stated, perhaps anecdotally, to Mr. Wratchford that he "told [Mr. Harms] to give it to me."

---

[4] We find it pertinent to note that the record indicates Mr. Harms was also once an employee of FSI.

[5] This is so because Mr. Ayersman had apparently been on medical leave for several weeks prior to the Wratchford fire. Of note, Mr. Ayersman returned to work for the WVSFMO on the day the Wratchford fire was reported to the WVSFMO. Also of note, Mr. Ayersman had returned to work for FSI several days prior to his return to work for the WVSFMO.

On February 24, 2017, Mr. Ayersman began his investigation into the Wratchford fire. As part of his investigation he interviewed the Wratchfords, then inspected the interior and exterior of the home. During his inspection of the basement stairs Mr. Ayersman used a device to detect ignitable liquids, and the device alerted to the presence of such liquids at that time. However, further testing revealed that no ignitable liquids were present at the scene of the fire. At the conclusion of his initial inspection, Mr. Ayersman indicated he believed the fire to be incendiary in nature.

Mr. Ayersman returned for a follow-up inspection of the home on February 27, 2017. That inspection was undertaken with Mr. Harris and the electrical engineer retained by Erie. The electrical engineer eliminated faulty electrical wiring and electrical problems as potential sources of the fire, explaining that the damaged wiring observed by VFD Chief Mongold was *caused by* the fire, rather than the source of it.

Thereafter, on March 9, 2017, Ms. Wratchford voluntarily consented to a polygraph examination conducted by civilian polygraph examiner and former West Virginia State Police Officer Kevin Pansch. Mr. Pansch asked Ms. Wratchford a series of questions about the fire and her whereabouts on the day of the incident, determining that several of her answers indicated deception. After the polygraph examination concluded, Mr. Pansch and Mr. Ayersman interviewed Ms. Wratchford, at which time she allegedly admitted to having previously placed a lit candle beneath a tabletop Christmas tree in hopes

5

that it would burn the house down.[6]  However, notwithstanding this prior attempt, Ms. Wratchford denied having set the fire on February 20.

The interview also revealed that the Wratchfords were experiencing significant financial problems, including that their mortgage was approximately $6,000 in arrears.  Further, Mr. Ayersman informed Ms. Wratchford that he had discovered she had failed to pay personal property taxes in 2016, and that, despite this failure, the Wratchfords' motor vehicles were all properly licensed.  Mr. Ayersman expressed his concern that Ms. Wratchford had abused her position as an employee of the West Virginia Division of Motor Vehicles ("DMV") to fraudulently register the family's cars.  Though she initially denied having done so, Ms. Wratchford ultimately admitted — in a signed and handwritten statement — to having provided falsified property tax receipts to another DMV employee in order to fraudulently register her vehicles.[7]

As the interview was ending Ms. Wratchford attempted to retract her admission that she had previously attempted to set the home ablaze; she also became

---

[6] When he was deposed, Mr. Pansch stated he did not recall Ms. Wratchford making this admission.  However, we take care to note that Ms. Wratchford's own deposition includes multiple references to this incident.  A jury might reasonably construe her statements as an admission to a prior arson attempt.

[7] Mr. Ayersman reported Ms. Wratchford's conduct to the West Virginia State Police ("State Police"), who then contacted the DMV.  As noted, Ms. Wratchford admitted to having abused her position as a DMV employee to fraudulently register her vehicles. She subsequently resigned from her position at the DMV.

physically ill.  Later that evening, Ms. Wratchford attempted suicide, and was admitted to the hospital for several days to recover.

In the meantime, Mr. Ayersman continued his investigation into the Wratchford fire.  Specifically, he turned his efforts to collecting information about the Wratchfords' financial troubles.  In so doing, he confirmed that the Wratchfords were significantly behind on their mortgage payments and that their lender had begun foreclosure proceedings.  Mr. Ayersman also subpoenaed the Wratchfords' bank statements, which indicated that at the time of the fire the Wratchfords maintained four checking accounts, with balances of $0.26, $66.13, $103.70, and $1,330.54.

As a result of his investigation, Mr. Ayersman concluded that Ms. Wratchford intentionally set the fire on February 20 in order to collect insurance money.[8]  Mr. Ayersman provided his entire case file, along with his findings, to his WVSFMO supervisors, Mr. Harms and Deputy State Fire Marshal Jason Baltic.  Upon review of the file, Mr. Harms and Mr. Baltic directed Mr. Ayersman to pursue criminal charges against Ms. Wratchford.

On June 16, 2017, Mr. Ayersman did just that; he filed criminal complaints against Ms. Wratchford, charging her with first-degree arson, two counts of burning or

---

[8] Separately, Mr. Harris reached the same conclusion and reported his findings to Erie.

attempting to burn insured property (one resulting from the previous attempt to set the home on fire), insurance fraud, and attempt to commit arson. In essence, the complaints alleged that Ms. Wratchford intentionally set the fire in an effort to collect insurance money so that she could bring the Wratchfords' mortgage current and avoid foreclosure.[9] A Hardy County magistrate reviewed the complaints and found probable cause to issue an arrest warrant for Ms. Wratchford. Two days later, Ms. Wratchford was taken into custody, and on June 26, 2017, the magistrate held a preliminary hearing and found probable cause to bind over the criminal charges to a Hardy County grand jury.[10]

The criminal charges were presented to the grand jury in February 2018, but there were multiple irregularities during the proceedings. Specifically, the prosecuting attorney declined to call Mr. Ayersman as a witness regarding the results of the investigation. Instead, the prosecutor called an assistant fire marshal, Paul Alloway, who was uninvolved with and had little knowledge of the investigation of the Wratchford fire. The prosecutor also presented the testimony of an expert witness, Larry Rine, regarding

---

[9] We would note that Mr. Ayersman's complaints provided selective information to the magistrate regarding the Wratchfords' financial problems, insofar as the complaints only referenced the bank account containing $0.26.

[10] On July 11, 2017, Erie denied coverage for the fire loss and damages to the Wratchford home. Erie did, however, provide $5,000 to Mr. Wratchford under the innocent spouse doctrine, as no criminal charges were lodged against him and there was no evidence indicating that he was involved in the attempted arson. It appears Mr. Wratchford used a portion of that disbursement to bring the Wratchfords' mortgage out of arrears.

8

the origin and cause of the fire.[11]  In so doing, the prosecutor represented to the grand jury that Mr. Rine was "an independent expert for the state" when, in fact, this was blatantly untrue — Mr. Rine was retained and compensated by the Wratchfords.  Ultimately the grand jury returned no true bill on the charges against Ms. Wratchford, so all charges were dismissed, without prejudice.

Thereafter, Mr. Wratchford filed an ethics complaint alleging that Mr. Ayersman's conduct during the investigation constituted violations of the Ethics Act.[12] The complaint was referred to the Probable Cause Review Board ("Review Board") of the West Virginia Ethics Commission ("Ethics Commission"), which conducted an investigation and dismissed the complaint, concluding that Mr. Ayersman had not "materially violated any prohibition of the Ethics Act, West Virginia Code §§ 6B-1-1 to 6B-3-11."

The Wratchfords then filed a civil action in the Circuit Court of Hardy County against Mr. Ayersman, the WVSFMO, Erie, FSI and others, alleging multiple causes of action.  As to Mr. Ayersman, the Wratchfords alleged: (1) negligence in the performance of the investigation; (2) tortious interference with employment contracts; (3) intentional infliction of emotional distress; (4) civil conspiracy with the other defendants

---

[11] Mr. Rine testified that the fire was caused by faulty electrical wiring.

[12] W. Va. Code §§ 6B-1-1 to -3-11.

to illegally deny the Wratchfords insurance coverage for the fire; (5) malicious prosecution; and (6) abuse of process. With respect to the WVSFMO, the Wratchfords alleged failure to properly investigate the fire, ignoring exculpatory evidence; and failure to property train, supervise, and oversee Mr. Ayersman's conduct during the investigation.

Both Mr. Ayersman and the WVSFMO filed motions for summary judgment, alleging they were entitled to qualified immunity. The Wratchfords opposed the motions, arguing that there remained several outstanding issues of fact bearing upon whether the conduct underlying the claims amounted to violations of clearly established law, or was otherwise fraudulent, malicious, or oppressive such that qualified immunity would be lost. For the most part agreeing with the Wratchfords, the circuit court issued two separate orders granting, in part,[13] and denying, in part, Mr. Ayersman's and the WVSFMO's motions for summary judgment. In short, the circuit court determined that several genuine issues of material fact remained outstanding, and that the question of Mr. Ayersman's and the WVSFMO's entitlement to qualified immunity should be submitted to the jury.

---

[13] As discussed *infra*, the circuit court granted Mr. Ayersman's motion for summary judgment on the tortious interference claim. That decision was not predicated on qualified immunity, but on the merits of that claim.

Mr. Ayersman and the WVSFMO then filed separate appeals to this Court. By order dated January 13, 2022, we consolidated those appeals for purposes of oral argument, consideration, and decision.

## II. STANDARD OF REVIEW

This appeal involves orders granting in part, and denying in part motions for summary judgement. This Court has held that we "'review[] *de novo* the denial of a motion for summary judgment, where such a ruling is properly reviewable by this Court.' Syl. Pt. 1, *Findley v. State Farm Mut. Auto. Ins. Co.*, 213 W.Va. 80, 576 S.E.2d 807 (2002)." Syl. Pt. 1, *W. Va. Reg'l Jail & Corr. Facility Auth. v. A.B.*, 234 W. Va. 492, 766 S.E.2d 751 (2014). Moreover, "[a] circuit court's denial of summary judgment that is predicated on qualified immunity is an interlocutory ruling which is subject to immediate appeal under the 'collateral order' doctrine." Syl. Pt. 2, *Robinson v. Pack*, 223 W. Va. 828, 679 S.E.2d 660 (2009). We have also held that "[a] circuit court's entry of summary judgment is reviewed *de novo*." Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994). However, "[i]n cases where interlocutory review of qualified immunity determinations occurs, any summary judgment rulings on grounds other than immunity are reserved for review at the appropriate time should the interlocutory appeal result in finding immunity inapplicable under the circumstances." *City of Saint Albans v. Botkins*, 228 W. Va. 393, 397 n.13, 719 S.E.2d 863, 867 n.13 (2011). With these standards in mind, we address the parties' arguments.

11

### III. DISCUSSION

On appeal, the petitioners raise several assignments of error. Mr. Ayersman contends that the circuit court erred in denying his motion for summary judgment as to the negligence claims pled in the Wratchfords' Amended Complaint, as well as his motion for summary judgment as to claims of intentional infliction of emotional distress, civil conspiracy, malicious prosecution, and abuse of process. The WVSFMO argues that the circuit court erred by failing to grant its motion for summary judgment as to the Wratchfords' claim that the WVSFMO negligently trained and supervised Mr. Ayersman. The WVSFMO also asserts that the circuit court erred in failing to grant its motion for summary judgment insofar as it is entitled to qualified immunity for its employees' discretionary acts and insofar as Mr. Ayersman's alleged conduct was outside the scope of his employment.

The Wratchfords raise two cross-assignments of error. Specifically, they argue that the circuit court erred in dismissing their claim for tortious interference against Mr. Ayersman, and in concluding that the Ethics Act cannot constitute a "statutory or constitutional rights violation" to defeat a claim of qualified immunity. We address each of the parties' arguments in turn.

### A. *Negligence Claim against Mr. Ayersman*

We begin our analysis with Mr. Ayersman's argument that the circuit court erred in denying his motion for summary judgment as to the Wratchfords' claim that he

was negligent in investigating the Wratchford fire.  Mr. Ayersman contends that the law of this state unequivocally provides that negligence claims against public officials in the performance of discretionary functions are barred.  He draws this from the following holdings:

> If a public officer is either authorized or required, in the exercise of his judgment and discretion, to make a decision and to perform acts in the making of that decision, and the decision and acts are within the scope of his duty, authority, and jurisdiction, he is not liable for negligence or other error in the making of that decision, at the suit of a private individual claiming to have been damaged thereby.
>
> . . . .
>
> In the absence of an insurance contract waiving the defense, the doctrine of qualified or official immunity bars a claim of mere negligence against a State agency not within the purview of the West Virginia Governmental Tort Claims and Insurance Reform Act, W.Va. Code § 29-12A-1, *et seq.*, and against an officer of that department acting within the scope of his or her employment, with respect to the discretionary judgments, decisions, and actions of the officer.

Syl. Pts. 4 and 6, *Clark v. Dunn*, 195 W. Va. 272, 465 S.E.2d 374 (1995).

While we agree that this Court has generally recognized that claims sounding in "mere negligence" against public officials cannot stand, the claim asserted in this case belies that characterization.  Syllabus point ten of *A.B.* directs a reviewing court to "first identify the nature of the governmental acts or omissions which give rise to the suit for purposes of determining" whether qualified immunity applies.  *A.B.*, 234 W. Va. at 497, 766 S.E.2d at 756.  While respondents assert generally that Mr. Ayersman acted

"negligently" in his investigation of the fire, their specific allegations and the evidence adduced reveal far more than the type of "mere negligence" rendered immune pursuant to *Clark*.   In fact, the Amended Complaint illustrates that this "negligence" claim is predicated on intentional conduct and is essentially a watered-down version of the Wratchfords' civil conspiracy claim, as they allege that "[e]ach of the [d]efendants were negligent in their reliance upon the work product of the other investigators. . .in determining the causation of the fire[.]" Taken in conjunction with the rest of the Amended Complaint, which alleges that the named defendants worked in concert to deprive the Wratchfords of the insurance proceeds — namely the civil conspiracy claim pled in the same Amended Complaint — it is clear this is not a claim of "mere negligence," but one predicated on intentional conduct allegedly undertaken to prevent the Wratchfords from recovering under their insurance policy.  For this reason, we conclude that the Wratchfords' negligence claim is mischaracterized and, thus, is not explicitly barred by the doctrine of qualified immunity under syllabus point six of *Clark*.  *See* 195 W. Va. at 274, 465 S.E.2d at 376, syl. pt. 6.

That said, Mr. Ayersman is still a state employee, so he may still be entitled to qualified immunity for causes of actions arising from the acts or omissions that underlie the Wratchfords claims.  In this regard, we have explained that

> [t]o the extent that governmental acts or omissions which give rise to a cause of action fall within the category of discretionary functions, a reviewing court must determine whether the plaintiff has demonstrated that such acts or omissions are in violation of clearly established statutory or

14

> constitutional rights or laws of which a reasonable person would have known or are otherwise fraudulent, malicious, or oppressive in accordance with *State v. Chase Securities, Inc.*, 188 W.Va. 356, 424 S.E.2d 591 (1992). In absence of such a showing, both the State and its officials or employees charged with such acts or omissions are immune from liability.

*A.B.*, 234 W. Va. at 497, 766 S.E.2d at 756, syl. pt. 11.

The Wratchfords argued below, as they do on appeal, that Mr. Ayersman violated the Ethics Act, specifically West Virginia Code § 6B-2-5(e)[14], insofar as he communicated information about the investigation of the fire at their home to third parties. However, the Wratchfords' argument on this point is flawed; the Review Board explicitly found that no such violation had been committed. More specifically, any information Mr. Ayersman shared with third parties (Erie and FSI) was not confidential; moreover, the WVSFMO has no policy prohibiting fire marshals from sharing information regarding such information with third parties like fire insurers and private companies investigating suspicious fires.[15]

---

[14] West Virginia Code § 6B-2-5(e) provides, in relevant part that "[n]o present or former public official or employee may knowingly and improperly disclose any confidential information acquired by him or her in the course of his or her official duties nor use such information to further his or her personal interests or the interests of another person."

[15] In fact, the existence of such a policy would seem counterintuitive insofar as the very function of the WVSFMO is to investigate potential arsons and the results of such investigations would necessarily be of use to an insurance company in determining how to handle an insurance claim resulting from a fire.

On appeal, the Wratchfords contend that the Review Board was misled by the WVSFMO, arguing that the WVSFMO falsely represented to the Review Board that there was "no policy against sharing information about fire investigations with other agencies, law enforcement, or insurance companies." However, the Wratchfords have cited nothing purporting to show the existence of such a policy; rather, their only citation is to an email from Mr. Ayersman which includes language stating that he will not share information with third parties. The unrefuted testimony below established that Mr. Ayersman added that language to the emails himself, not at the request of the WVSFMO. In the absence of any citation — to the record or otherwise — purporting to show that such a policy against sharing information with insurance companies exists, we cannot conclude that there has been a violation of the Ethics Act, or that the circuit court erred in finding that no such violation had been shown.

To reiterate, the Wratchfords' entire argument that Mr. Ayersman violated some clearly established statutory or constitutional right or law hinges upon an alleged violation of the Ethics Act. The Probable Cause Review Board ("Review Board") of the West Virginia Ethics Commission — which is specifically tasked with determining whether an ethics violation has occurred — definitively concluded that a violation did not occur. Other than a bare allegation that the Review Board was misled, the Wratchfords

16

have presented this Court with nothing to indicate that conclusion was flawed. Accordingly, the Wratchfords' argument on this point must fail.[16]

Given that the Wratchfords cannot establish a violation of clearly established constitutional or statutory laws or rights, the only way they can overcome the presumption of qualified immunity for Mr. Ayersman is to demonstrate that his conduct in investigating the fire was fraudulent, malicious, or oppressive. We have held:

> The ultimate determination of whether qualified or statutory immunity bars a civil action is one of law for the court to determine. Therefore, unless there is a bona fide dispute as to the foundational or historical facts that underlie the immunity determination, the ultimate questions of statutory or qualified immunity are ripe for summary disposition.

Syl. Pt. 1, *Hutchison v. City of Huntington*, 198 W. Va. 139, 479 S.E.2d 649 (1996). We have also stated in *Maston v. Wagner*, 236 W. Va. 488, 508 n.15, 781 S.E.2d 936, 956 n.15 (2015), that questions regarding malice "are questions for the fact-finder."

In examining the record before this Court, we have little trouble determining that there are enough disputed "foundational or historical facts" regarding Mr. Ayersman's conduct during the investigation of the fire to preclude summary judgment on qualified

---

[16] The circuit court went a step further and held that the Ethics Act generally does not afford individual rights that may be enforced via civil suits, so it cannot be a "clearly established statutory or constitutional right or law," the violation of which can overcome qualified immunity. In their cross-assignment of error, the Wratchfords contend the circuit court erred in reaching this conclusion. However, because there is no violation of the Ethics Act in the case at bar, we need not address this argument.

17

immunity grounds. Specifically, we are most concerned with Mr. Ayersman's dual employment with the WVSFMO and FSI. To be clear, we are not stating that Mr. Ayersman's dual employment in and of itself constitutes fraudulent, malicious, or oppressive conduct.

Rather, the facts of this case indicate that there are serious questions as to for whom Mr. Ayersman was working during the investigation. Despite Mr. Ayersman's contention that he was working in his official fire marshal capacity during the investigation of the fire, several documents contained in the record call that into question, including Mr. Ayersman's time sheets listing the hours he worked for the WVSFMO and FSI — time sheets indicating that on more than one occasion he worked more than twenty-four hours a day. That necessarily implies that there was an overlap in the hours he was working for the WVSFMO and FSI.

Beyond this, we cannot ignore that there are questions surrounding Mr. Ayersman's contact with Mr. Harris prior to the investigation. While we acknowledge that Mr. Harris is Mr. Ayersman's supervisor in his private employment, the juxtaposition of that contact with the start of this investigation is troubling — particularly given other outstanding questions regarding *how* Mr. Ayersman came to be assigned to this investigation by the WVSFMO. Similarly, it is not unreasonable to think a jury might find that Mr. Ayersman's conduct during Ms. Wratchford's polygraph examination and interview could rise to the level of malice. An examination of the basic facts surrounding

18

that specific portion of the investigation reveals not only that it lasted four-and-a-half hours, but that Ms. Wratchford became physically ill during the interview, and that there are disputes about the admission she allegedly made therein. Moreover, those circumstances, when coupled with Ms. Wratchford's suicide attempt that evening, leave far more questions than answers regarding the tactics employed during the interview.

Finally, we note that the Wratchfords have alleged that Mr. Ayersman included false or misleading information in the criminal complaints he filed with the magistrate court at the close of his investigation. In particular, the Wratchfords contend Mr. Ayersman did not accurately represent their finances, insofar as he did not provide the magistrate court with a complete list of the Wratchfords' bank accounts in an effort to imply that Ms. Wratchford had a motive to commit arson. In a similar vein, the Wratchfords contend that Mr. Ayersman falsely alleged Ms. Wratchford admitted to a prior arson attempt when she left a lit candle burning under a tabletop Christmas tree. As noted above, the record calls into question whether Ms. Wratchford made such an admission, as she denies having done so and the polygraph examiner, when deposed, also stated he did not recall her making that admission. However, in her own deposition, Ms. Wratchford recounts the incident, so it is not outside of the realm of possibility that she did make such an admission during or after the polygraph examination. Ultimately, whether the inclusion of that admission in the criminal complaints is evidence of fraud, malice, or oppression sufficient to overcome qualified immunity is not our charge, but that of the jury on remand.

19

Based on the foregoing, we agree with the circuit court that there are disputes of historical or foundational fact that warrant review by a factfinder before a determination can be made as to whether Mr. Ayersman is entitled to qualified immunity on the negligence claims. Accordingly, we affirm the circuit court's order on this point.

**B.** **_Intentional Acts Claims against Mr. Ayersman_**

Mr. Ayersman next argues the circuit court should have found he was entitled to qualified immunity for the following intentional acts: (1) intentional infliction of emotional distress; (2) civil conspiracy; (3) malicious prosecution; and (4) abuse of process. The theory underlying each of these is that Mr. Ayersman worked in concert with FSI and Erie to determine that the fire at the Wratchfords' home was the result of arson so Erie would not have to pay the Wratchfords' insurance claim. Mr. Ayersman contends that, because each of these claims stem from the allegedly wrongful arrest, charge, and prosecution of Ms. Wratchford, he is entitled to qualified immunity insofar as he had probable cause to file charges against her. We disagree.

In making his argument Mr. Ayersman cites to a decision of the United States Court of Appeals for the Fourth Circuit, which held that in determining whether a law enforcement officer like the fire marshal "is entitled to qualified immunity, the guiding principle is that '[o]nly where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost.'" *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991) (quoting *Malley v.*

20

*Briggs*, 475 U.S. 335, 344-45 (1986)). Essentially, he argues that a magistrate found probable cause to arrest and charge Ms. Wratchford, so he is necessarily entitled to qualified immunity. However, in making his argument, Mr. Ayersman overlooks pertinent authority in West Virginia which undermines his position.

While a magistrate found probable cause to arrest and charge Ms. Wratchford, we note that the grand jury specifically declined to indict her. This Court has recognized that "'public policy favors prosecution for crimes and requires the protection of a person who in good faith and upon reasonable grounds institutes proceedings upon a criminal charge. The legal presumption is that every prosecution for crime is founded upon probable cause and is instituted for the purpose of justice.'" Syl. Pt. 3, *Jarvis v. W. Va. State Police*, 227 W. Va. 472, 711 S.E.2d 542 (2010) (quoting Syl. Pt. 4, *McNair v. Erwin*, 84 W. Va. 250, 99 S.E. 454 (1919)). In this context we have recognized that, while "a grand jury indictment is prima facie evidence of probable cause for the underlying criminal prosecution. . .*a plaintiff may rebut this evidence by showing that the indictment was procured by fraud, perjury, or falsified evidence*." *Id*. at 474, 711 S.E.2d at 544, syl. pt. 5, in part (emphasis added). This comports with our longstanding holding that "the discharge by a justice of the plaintiff, who has been arrested and brought before him for examination, *or the refusal of the grand jury to indict him*, is *prima facie* evidence of a want of probable cause." *Thomas v. Beckley Music & Elec. Co*., 146 W. Va. 764, 773, 123 S.E.2d 73, 78 (1961) (citing Syl. Pt. 2, in part, *Harper v. Harper*, 49 W. Va. 661, 39 S.E. 661 (1901)) (some emphasis added).

21

Here, the Hardy County grand jury explicitly declined to indict Ms. Wratchford; under the law in this state, that is evidence of a want of probable cause. Accordingly, Mr. Ayersman's assertion that he is entitled to immunity on the grounds that he had probable cause to charge Ms. Wratchford must be reviewed by the finder of fact. That said, even if the grand jury had indicted her, thus creating a prima facie showing of probable cause, Ms. Wratchford would still be entitled to rebut that evidence by showing that the indictment was procured by fraud, perjury or falsified evidence. As discussed *supra*, she raised several allegations to that effect insofar as she asserted that Mr. Ayersman's criminal complaints contained false and misleading statements — in the form of omitted financial information, and the inclusion of an allegedly false statement that Ms. Wratchford admitted to a prior arson attempt.

In this regard, we explained long ago that "[p]robable cause in [a] malicious prosecution action is generally [a] mixed question of law and fact[.]" Syl. Pt. 3, in part, *Staley v. Rife*, 109 W. Va. 701, 156 S.E. 113 (1930). We have further explained that

> [i]n a civil action for malicious prosecution, the issues of malice and probable cause become questions of law for the court *where the evidence pertaining thereto is without conflict*, or, though conflicting in some respects, is of such nature that only one inference may be drawn therefrom by reasonable minds.

Syl. Pt. 7, *Truman v. Fid. & Cas. Co. of N.Y.*, 146 W. Va. 707, 123 S.E.2d 59 (1961) (emphasis added). Without question, the facts surrounding the arrest, charging, and prosecution of Ms. Wratchford are in conflict; accordingly, our holding in *Truman* dictates

22

that the questions of probable cause and malice in this action are not questions of law, but are instead questions of fact which must be submitted to a jury.[17]

In examining the remaining claims, we have even less trouble determining that summary judgment would not have been appropriate. As to the intentional infliction of emotional distress claim, there are questions regarding Mr. Ayersman's conduct, including his tactics in interviewing Ms. Wratchford, and his allegedly acting in concert with the other defendants to falsify the results of the investigation. Likewise with respect to the civil conspiracy claim, as the Wratchfords allege that each of the defendants, including Ayersman and the WVSFMO, acted jointly to accomplish an unlawful purpose, in that they allegedly fabricated a finding of arson to relieve Erie of its obligation to pay the Wratchfords' insurance claim. The record, as noted in the preceding sections, contains

---

[17] As a final aside, we would also point out that some of the disputes may inure to *Mr. Ayersman's* benefit. In particular, there were myriad irregularities in the presentation of the criminal charges against Ms. Wratchford to the grand jury. These include but are not limited to the prosecutor's decision to call a fire marshal totally uninvolved in the investigation to testify on behalf of the WVSFMO, and the prosecutor's flagrant misrepresentation to the grand jury that an expert witness retained and compensated by the Wratchfords was "an independent witness for the State." While we cannot say that these irregularities influenced the grand jury in its decision not to indict Ms. Wratchford, a civil jury may come to that conclusion. In that instance, the civil jury could reasonably find that, despite the grand jury's refusal to indict Ms. Wratchford, Mr. Ayersman had probable cause to seek her prosecution. In that event Mr. Ayersman would be entitled to qualified immunity on these claims.

23

evidence that could lead a jury to find that Ayersman and the WVSFMO are not entitled to qualified immunity to shield them from these claims.

Ultimately, the circuit court correctly concluded that there are issues of fact which must be resolved in order to determine whether Mr. Ayersman is entitled to qualified immunity with regard to the Wratchfords' claims of intentional tortious conduct. For this reason, we affirm the circuit court's denial of summary judgment as to these claims.

## C. *The WVSFMO's Immunity*

First, the WVSFMO argues that if Mr. Ayersman is immune, the WVSFMO must also be immune under a theory of vicarious liability. Since Mr. Ayersman's immunity is yet to be resolved, this argument is premature.

Second, the WVSFMO argues that even if Mr. Ayersman is not immune, his conduct falls outside the scope of his employment and therefore the WVSFMO cannot be held to account for it. Several of the Wratchfords' claims against Mr. Ayersman could be construed as alleging conduct that is not in the ordinary course of his job duties, including the allegations surrounding Mr. Ayersman's conduct during the polygraph examination and interview, and the allegation that he falsely indicated that Ms. Wratchford admitted to a prior arson attempt. If these allegations are found to be true, a jury may conclude that this conduct was outside the scope of Mr. Ayersman's employment, negating WVSFMO's vicarious liability.

24

To this point, we have plainly held that

> [i]f the plaintiff identifies a clearly established right or law which has been violated by the acts or omissions of the State, its agencies, officials, or employees, or can otherwise identify fraudulent, malicious, or oppressive acts committed by such official or employee, the court must determine whether such acts or omissions were within the scope of the public official or employee's duties, authority, and/or employment. To the extent that such official or employee is determined to have been acting outside of the scope of his duties, authority, and/or employment, the State and/or its agencies are immune from vicarious liability, but the public employee or official is not entitled to immunity in accordance with *State v. Chase Securities, Inc*., 188 W.Va. 356, 424 S.E.2d 591 (1992) and its progeny. If the public official or employee was acting within the scope of his duties, authority, and/or employment, the State and/or its agencies may be held liable for such acts or omissions under the doctrine of *respondeat superior* along with the public official or employee.

*A.B.*, 234 W. Va. at 497, 766 S.E.2d at 756, syl. pt. 12. We further recognized in *A.B.* that "whether an agent is 'acting within the scope of his employment and about his employer's business [. . .] is *generally* a question of fact for the jury and a jury determination on that point will not be set aside *unless clearly wrong*." *Id*. at 509, 766 S.E.2d at 768 (quoting Syl. Pt. 4, in part, *Griffith v. George Transfer and Rigging, Inc*., 157 W. Va. 316, 201 S.E.2d 281 (1973)) (emphasis in original). We elaborated upon this by stating that

> "[o]rdinarily, the determination whether an employee has acted within the scope of employment presents a question of fact; it becomes a question of law, however, when 'the facts are undisputed and no conflicting inferences are possible.' In some cases, the relationship between an employee's work and wrongful conduct is so attenuated that a jury could not reasonably conclude that the act was within the scope of employment."

25

*Id*. (quoting *Mary M. v. City of Los Angeles*, 814 P.2d 1341 (Cal. 1991)). In the case at bar there are many disputed facts regarding Mr. Ayersman's conduct. A jury must determine whether Mr. Ayersman was acting within the scope of his employment. Until that determination is made, the WVSFMO's entitlement to qualified immunity cannot be resolved.

Finally, the WVSFMO contends that the circuit court erred in finding that it was not entitled to qualified immunity on the Wratchfords' claim that the WVSFMO negligently trained and supervised Mr. Ayersman. This Court has recognized that "broad categories of training, supervision, and employee retention . . . easily fall within the category of 'discretionary' governmental functions." *Id*. at 514, 766 S.E.2d at 773. As such, we once again apply the standard that a government entity engaged in performing discretionary functions is entitled to immunity unless the plaintiff demonstrates "that such acts or omissions are in violation of clearly established statutory or constitutional rights or laws . . . or are otherwise fraudulent, malicious, or oppressive[.]" *Id*. at 497, 766 S.E.2d at 756, syl. pt. 11.

In this regard, the Wratchfords contend that Mr. Ayersman's WVSFMO supervisors assisted in orchestrating this faulty investigation by: (1) assigning him to the investigation despite knowing of his potential conflict of interest; (2) condoning, accepting, or covering up his alleged failure to adhere to WVSFMO policies and the law; (3) providing allegedly false information to the Ethics Commission to protect Mr. Ayersman; and (4)

26

directing Mr. Ayersman to file allegedly unfounded criminal charges against Ms. Wratchford. Assuming a jury determined Mr. Ayersman's conduct below was fraudulent, malicious, or oppressive, it is not unreasonable that the same jury may find that the WVSFMO acted in a manner which would strip it of qualified immunity for its discretionary supervision of Mr. Ayersman. As stated above, the resolution of this question lies with a jury, as it is contingent upon the resolution of numerous disputed facts.

Based on the foregoing, each of the WVSFMO's arguments fails at this time because — as with Mr. Ayersman — there are multiple factual issues that must be resolved before an immunity determination can be made. Therefore, we affirm the circuit court's denial of summary judgment on these points.

### D. The Wratchfords' Cross-Assignments of Error

The Wratchfords advance two cross-assignments of error in this appeal. First, they contend that the circuit court erred in concluding that a violation of the Ethics Act is not a "violation of clearly established statutory or constitutional rights or laws" sufficient to thwart summary judgment. As noted above, the Review Board of the Ethics Commission has already determined that there was no violation of the Ethics Act in this case, so we need not determine whether the circuit court erred in this regard.

As such, the only remaining argument the Wratchfords advance is that the circuit court erred in granting Mr. Ayersman's motion for summary judgment regarding

their tortious interference claim. The Wratchfords argued below that Mr. Ayersman tortiously interfered with Ms. Wratchford's employment with the DMV. Specifically, they contend that Mr. Ayersman investigated the Wratchfords' finances and discovered that they had not paid personal property taxes for some three years. That failure to pay property taxes would have precluded the Wratchfords from renewing their motor vehicle registrations, yet their registrations were current. This was accomplished because Ms. Wratchford falsified property tax receipts and used her position as a DMV employee to fraudulently register the Wratchfords' vehicles. Mr. Ayersman notified Ms. Wratchford of his discovery and his intention to pass the information along to the State Police. While Ms. Wratchford initially denied any wrongdoing, she later admitted she engaged in this conduct in a handwritten, signed statement. Mr. Ayersman did ultimately inform the State Police, and the State Police subsequently informed the DMV. Thereafter, Ms. Wratchford voluntarily resigned from her position at the DMV.

On appeal, as she did below, Ms. Wratchford asserts that this amounts to tortious interference, insofar as Mr. Ayersman's informing the State Police of her conduct resulted in the loss of her employment. This Court has explained that a prima facie case of tortious interference is established by showing: (1) existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages. *See* syl. pt. 5, *Hatfield v. Health Mgmt. Assocs. of W. Va.*, 223 W. Va. 259, 672 S.E.2d 395 (2008). Once a prima facie case is made, a defendant may prove

28

justification or privilege and affirmative defenses. *Id.* Under the facts of this case, there is no question that Ms. Wratchford made out a prima facie case of tortious interference. However, Mr. Ayersman had a clear affirmative defense: truth.

In syllabus point five of *Tiernan v. Charleston Area Medical Center, Inc.*, 203 W. Va. 135, 506 S.E.2d 578 (1998), we held:

> In the context of tortious interference with a business relationship, one who intentionally causes a third person not to perform a contract or not to enter into a prospective business relation with another does not interfere improperly with the other's business relation by giving the third person (a) truthful information, or (b) honest advice within the scope of a request for the advice. Restatement (Second) of Torts § 722 (1979).

The information Mr. Ayersman provided to the State Police was truthful, as evidenced by Ms. Wratchford's own handwritten, signed admission to that effect. Therefore, his conduct did not amount to tortious interference, and the circuit court properly granted his motion for summary judgment on that claim. Accordingly, we affirm the circuit court's grant of summary judgment on that point.

## IV. CONCLUSION

Based on the foregoing, we affirm the Circuit Court of Hardy County's February 9, 2021, "Order Granting In Part and Denying In Part Defendant Ronald C. Ayersman's Motion for Summary Judgment" and its February 9, 2021, "Order Denying West Virginia State Fire Marshal's Office's Motion for Summary Judgment."

29

Affirmed.